ALICIA ERICKSON ET AL. *v.* DOROTHY
ERICKSON, EXECUTRIX (ESTATE
OF RONALD K. ERICKSON)
(SC 15860)

Borden, Berdon, Katz, Palmer and Peters, Js.[1]

---

[1] The panel in the case was originally composed of Justices Borden, Berdon, Katz, McDonald and Peters. After oral argument before this court, Justice McDonald recused himself from this appeal. Justice Palmer was then added to the panel, and he participated in the decision after reviewing the briefs and listening to the tape recording of the oral argument.

Argued March 24—officially released August 18, 1998

*Alinor C. Sterling*, with whom was *Howard A. Jacobs*, for the appellant-appellee (named plaintiff).

*Jeremiah Donovan*, for the appellee-appellant (defendant).

*Opinion*

BORDEN, J. The dispositive issue in this appeal is whether, pursuant to General Statutes (Rev. to 1995) § 45a-257 (a), the trial court should have admitted extrinsic evidence regarding the decedent's intent that

his will would not be revoked automatically by his sub-
sequent marriage.[2] The named plaintiff, Alicia Erick-
son,[3] who is the daughter of the decedent, Ronald K.
Erickson, appeals[4] from the judgment of the trial court

[2] General Statutes (Rev. to 1995) § 45a-257 (a) provides: "If, after the
making of a will, the testator marries or is divorced or his marriage is
annulled or dissolved or a child is born to the testator or a minor child is
legally adopted by him, or a child is born as a result of A.I.D. as defined in
section 45a-771, to which the testator has consented in accordance with
subsection (a) of section 45a-772, and no provision has been made in such
will for such contingency, such marriage, divorce, annulment, dissolution,
birth or adoption of a minor child shall operate as a revocation of such will,
provided such divorce, annulment or dissolution shall not operate as a
revocation of such will if the spouse of the testator was not a beneficiary
under such will. The revocation of such will by divorce, annulment or
dissolution of marriage shall be effective only as to wills executed on and
after October 1, 1967."

Section 45a-257 (a) was repealed by 1996 Public Acts, No. 96-95, and, to
the extent that § 45a-257 (a) dealt with the effect of marriage on a will, it
has been replaced by General Statutes § 45a-257a, which provides: "Failure
of testator to provide for surviving spouse who married testator after execu-
tion of will. Determination of share of estate. (a) If a testator fails to provide
by will for the testator's surviving spouse who married the testator after
the execution of the will, the surviving spouse shall receive the same share
of the estate the surviving spouse would have received if the decedent left
no will unless: (1) It appears from the will that the omission was intentional;
or (2) the testator provided for the spouse by transfer outside the will and
the intent that the transfer be in lieu of a testamentary provision is shown
by the testator's statements, or is reasonably inferred from the amount of
the transfer or other evidence.

"(b) In satisfying a share provided in subsection (a) of this section, devises
and legacies made by the will abate in accordance with section 45a-426."

The effective date of § 45a-257a was January 1, 1997. Therefore, that
statute does not apply to this case because the will in question was executed
in 1988. At that time, the applicable statute was General Statutes § 45-162,
which was transferred to § 45a-257 in 1991. Because that statute remained
unchanged until Public Act 96-95, hereafter references to § 45a-257 are to
the 1995 revision of the statute.

[3] The decedent's other two daughters, Laura Erickson Kusy and Ellen
Erickson Cates, did not appeal from the judgment of the trial court. Hereafter,
we refer to Alicia Erickson as the plaintiff.

[4] The plaintiff appealed from the judgment of the trial court to the Appellate
Court, and we transferred the appeal to this court pursuant to Practice Book
§ 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-
199 (c).

in favor of the defendant, Dorothy Erickson,[5] the executrix of the estate of the decedent, dismissing the plaintiff's appeal from the decree of the Probate Court for the district of Madison. The Probate Court had admitted the will of the decedent to probate. The trial court ruled that the decedent's will, which had been executed shortly before his marriage to the defendant, provided for the contingency of marriage.

The plaintiff claims on her appeal that the trial court improperly concluded that the decedent's will provided for the contingency of marriage.[6] The defendant claims on her cross appeal that the trial court improperly excluded certain extrinsic evidence regarding the decedent's intent. We conclude that the trial court should have permitted the defendant to introduce extrinsic evidence of the decedent's intent. Accordingly, we reverse the judgment of the trial court and order a new trial.

Certain facts in this appeal are undisputed. On September 1, 1988, the decedent executed a will. At that time, he had three daughters and was unmarried. Two days later, on September 3, 1988, he married the defendant. He died on February 22, 1996.

The six articles of the will provide as follows.[7] The first article provides for the payment of funeral

---

[5] The defendant's name before her marriage to the decedent was Dorothy A. Mehring.

[6] The plaintiff also claims that the trial court improperly: (1) admitted evidence regarding the identity of certain named beneficiaries in the will; and (2) considered the time period between the execution of the decedent's will and his subsequent marriage. In view of our conclusion that a new trial is required at which the defendant's proffered extrinsic evidence will be admissible, we need not address these two claims because it is not clear that they will arise again.

[7] The decedent's will provides in relevant part:

"Article I: I order and direct that my funeral expenses and my just debts, if any, except such as are barred by the Statute of Limitations or otherwise outlawed, be paid as soon as may be practicable; provided, however, that if any such debts are secured by mortgages, my Executrix or Executor, as

expenses and debts by the estate. The second article states that the residue of the estate will pass to the

the case may be, shall pay such debts so secured only if, in her or his discretion, such payment shall appear to be for the benefit of my estate; and provided further that all legacy, succession, inheritance, transfer and estate taxes which may become payable by reason of my death, whether or not levied on property or estate passing by this, my Last Will and Testament, shall be paid by my Executrix or Executor out of my residuary estate in the same manner as an expense of administration, and shall not be pro rated or apportioned among or charged against the respective devisees, legatees, beneficiaries, transferees or other recipients, nor charged against any property passing or which may have passed to any of them, and that my Executrix or Executor shall not be entitled to reimbursement for any portion of any such tax from any person.

"Article II: All the rest, residue and remainder of my estate and property (hereinafter called my residuary estate) of every nature, character and description, whether real, personal or mixed, and wheresoever situate, of which I may die seized or possessed, or in or to which I may in any wise be interested or entitled at the time of my death, or under or with respect to which I shall have any power of disposition or appointment at the time of my death, I give, devise and bequeath to DOROTHY A. MEHRING, of Madison, Connecticut, provided she survives me.

"Article III: If said DOROTHY A. MEHRING predeceases me, I give, devise and bequeath my said residuary estate as follows:

"A. ONE-HALF (1/2), in equal parts, to my daughters, LAURA ERICKSON, ELLEN ERICKSON and ALICIA ERICKSON, all of Madison, Connecticut, or to the survivors or survivor of them.

"B. ONE-HALF (1/2), in equal parts, to THOMAS MEHRING and CHRISTOPHER MEHRING, both of Madison, Connecticut, and MAUREEN MEHRING and KATHLEEN MEHRING, both of Guilford, Connecticut, or to the survivors or survivor of them.

"Article IV: I hereby nominate, constitute, designate and appoint said DOROTHY A. MEHRING to be the Executrix of this, my Last Will and Testament, or in the event of her inability or refusal to act, I hereby nominate, constitute, designate and appoint ATTORNEY ROBERT J. O'BRIEN, of West Hartford, Connecticut, to be the Executor of this, my Last Will and Testament, and I order and direct that in no event shall my Executrix or Executor, as the case may be, be required to give any bond, undertaking or other security for the faithful performance of her or his duties as Executrix or Executor.

"Article V: I hereby give and grant unto my Executrix or Executor full power and authority to sell, convey, mortgage, pledge, lease, release or in any other way to dispose of the whole or any part of my real or personal property upon such terms and conditions as to my said Executrix or Executor, in her or his discretion, may seem proper and desirable, and for such purposes to execute, acknowledge and deliver any and all instruments,

defendant. The third article provides that if the defendant predeceases the decedent, one half of the residuary estate will pass in equal parts to the decedent's three daughters, Laura Erickson Kusy, Ellen Erickson Cates

under seal or otherwise, which may be necessary or required, and I hereby relieve my said Executrix or Executor from any and all responsibility for errors of judgment and mistakes of fact that she or he may be considered by anyone to have made in connection therewith. I hereby further authorize and empower my said Executrix or Executor to effect such divisions, partitions, apportionments or distributions of property, whether real or personal, as may be necessary or convenient under this, my Last Will and Testament, and in effecting the same, to divide, partition, apportion and distribute the same in kind without converting the same into cash or my said Executrix or Executor may sell the same and convert it into cash and distribute such cash among those entitled thereto, or she or he may make distribution partly in kind and partly in cash, and at such valuations as my said Executrix or Executor may deem proper. In effecting any divisions, partitions, apportionments or distributions, my Executrix or Executor may convey or assign different property or kinds of property to and among the persons entitled to distribution. The valuations placed by my said Executrix or Executor on any such property so divided, partitioned, apportioned or distributed in kind shall be binding upon all persons interested in this, my Last Will and Testament. My Executrix or Executor shall have full power, in her or his discretion, to litigate, compromise, adjust and settle all claims for or against my estate, and all controversies arising out of or in connection with the property constituting all or a part of my estate, upon such terms and conditions as she or he may deem just, and the decision of my Executrix or Executor shall be binding upon all persons interested in this, my Last Will and Testament. All powers conferred in this Article on my Executrix or Executor may be exercised by any person appointed by the Probate Court to administer my estate with the Will annexed. All powers conferred on my Executrix or Executor may be exercised by any person to whom ancillary letters testamentary may be issued in any other State than the State in which domiciliary letters testamentary are issued.

"Article VI: If at the time of my death any of my said daughters, LAURA ERICKSON, ELLEN ERICKSON and ALICIA ERICKSON, have not attained the age of eighteen (18) years, I nominate, constitute, designate and appoint said DOROTHY A. MEHRING to be the guardian of the person and of the estate of such minor child or children. In the event of her inability or refusal to act as such guardian, I hereby nominate, constitute, designate and appoint LOIS VALERIO and PETER VALERIO, both of West Hartford, Connecticut, or the survivor of them, to be the guardians of the person and of the estate of such minor child or children. I direct that no bond or other security shall be required of my guardian or guardians for the faithful performance of her, their or his duties as such guardian or guardians."

and Alicia Erickson, and one half of the residuary estate will pass in equal parts to Thomas Mehring, Christopher Mehring, Maureen Mehring and Kathleen Mehring, the children of the defendant. The fourth article appoints the defendant as the executrix of the will, with Attorney Robert O'Brien as the contingent executor in the event that the defendant is unable to or refuses to serve as executrix. The fifth article gives the executrix or executor the power to dispose of property of the estate as necessary. The sixth article appoints the defendant as the guardian of any of the decedent's children who have not reached the age of eighteen at the time of his death.

The Probate Court admitted the decedent's will to probate. The plaintiff appealed from the Probate Court's judgment. Prior to trial, the plaintiff filed a motion in limine to exclude extrinsic evidence of the decedent's intent. The plaintiff argued that "[§] 45a-257 makes the Court's inquiry very simple: to determine whether the will was revoked, the Court need examine only [the decedent's] will, his marriage certificate to [the defendant], and his death certificate. Extrinsic evidence regarding [the decedent's] intentions is inadmissible because the language of [the decedent's] will is unambiguous, and therefore under . . . [§] 45a-257 the operation of the marriage to revoke the will is automatic and mandatory." The defendant, in opposition to the plaintiff's motion, made a detailed offer of proof to show the contrary intent of the decedent.[8]

---

[8] The defendant's offer of proof provided: "May it please the court, if [O'Brien and the defendant] were permitted to testify they would testify as follows. [O'Brien] would testify that he is an attorney before the Hartford [bar], that he was for many years prior to the marriage in 1988 the attorney for [the decedent].

"In addition to being his attorney on a variety of business and personal matters, he was also a close friend of [the decedent]. He was aware that [the decedent] was courting [the defendant] who became [his wife] and he was invited to their wedding which was scheduled for September 3, 1988.

"About one week prior to that time he received a call from [the decedent] saying he and [the defendant] immediately after the wedding were going to

go to New York and then take a Concorde flight to Ireland and they wanted to arrange, as many of us do prior to events like that, for their wills to be drafted prior to the marriage ceremony.

"He gave him instructions that the wills would be identical, that is, that all of his estate was to go to [the defendant]. If [the defendant] should predecease him it should go to, half should go to his children, half to [the defendant's] children. That [the defendant] should be the administratrix of the will, the executrix, excuse me, the executrix of the will and that she would be appointed guardian of his children, and that [her] will be exactly the same.

"On Thursday, September 1, two days before the wedding, the two of them went to Hartford and executed the wills. I would offer [the defendant's] will as a piece of evidence. And I represent to the court that it is a mirror image of [the decedent's] will that you have admitted as an exhibit. She, like [the decedent], leaves everything to him. If he should predecease her half of her estate goes to his children, half to her children. He appoints her guardian of his children and appoints [her] executor of his estate.

"During the course of the execution of the wills there was no conversation whatsoever about the fact that the Saturday marriage would revoke the will that had been drafted on Thursday. The wedding to take place two days later would revoke the will that had been drafted on Thursday, although there was considerable discussion about the marriage itself and the festivities and the guests and things like that.

"[O'Brien] would testify that the reason that he did not place in the will any specific mention of the marriage or talk about it at all with [the defendant] or [the decedent] was because in his view when a man executes a will two days before his marriage in which he leaves everything to the woman that he's about to marry, makes her guardian of his children, makes her administrator of the, executor, executrix of the estate, and if she should predecease him, leaves half of his estate to her kids.

"Clearly makes provision in the will for not just a contingency, but the imminent [inevitability] of the marriage that's going to take place two days later. So he didn't think there was any necess[ity] that he had to put in words when it was so clear that it was making—

"He would further testify that in June of—he then became friends, close friends with [the defendant] as well as with [the decedent]. They lived together, he would testify they lived together up until 1995. Then in June of 1995 he received word that [the decedent] was seriously sick. . . . [T]wo or three days after [his] operation [O'Brien] visited him in the hospital. He learned from [the decedent] that [he] was dying and had a terminal disease.

"[The decedent] said that he wanted to make sure, he wanted to look at his estate situation and make sure that everything was going to be, was going to go to his wife, [the defendant]. The attorney then returned to his office, checked the will out, made sure that the will said it was going to [the defendant] and so informed [the decedent].

"By Thanksgiving [the decedent's] condition had deteriorated to the extent

that he was no longer able to continue functioning in everyday life and he was staying at home being cared for by [the defendant].

"On February 8, 1996, [O'Brien] would testify he again visited his dying friend and his client. [The defendant] was present throughout the course of this conversation which lasted more than two hours.

"Now much of this conversation was the kind of conversation that Your Honor would expect of one who is visiting a dying friend. They reminisced. They talked about politics. They talked about everything other than the disease for a while.

"Then they got onto the topic of his estate. The will itself was taken out of the place where it was kept. They reviewed it. The attorney once again assured the dying man that all of his estate was going to [the defendant].

"He then told the attorney that he wanted to make a separate provision for his children. He wanted the attorney to set up a corporation that would be called Sovereign Electric Company. He gave him a specific description of how the shares should be distributed. Thirteen percent of the shares were to go to each daughter. The attorney did set up that corporation. The shares were distributed to the daughters.

"And [the defendant] will testify that she has purchased the shares from the daughters for one hundred thousand dollars each daughter. That is, three hundred thousand dollars for the 39 percent that they received as a result of that. He then would, as Your Honor knows, that was on February 8. On February 22, [the decedent] died.

"[The defendant], may it please the court, would testify as follows. She is, in 1987 she was a widow. She had four children, T. Kevin, Kathleen, Maureen and Christopher. [The decedent], who would become her husband, had three children, Laura, Ellen and Alicia. They met in the fall of 1987. They courted and they became engaged on February 14, 1988.

"They obtained a marriage license at the Town Clerk's Office on August 22, 1988. That actually is a piece of evidence that's before Your Honor in the form of the Marriage License.

"They married in a church ceremony. She would testify that this ceremony was planned many, many months in advance. It was quite elaborate. There were about one hundred and fifty guests. She and [the decedent] acted together in planning all of the events of the wedding.

"As the attorney has testified, their plan was to get married on . . . Saturday afternoon and evening after the reception to go to New York, stay in a hotel that night and then fly on the Concorde to Ireland the next day which is exactly what they did.

"The invitations for the wedding and all the plans for the wedding were made for September 3, Saturday, September 3. In talking to [the decedent] they decided that before they flew off to Europe they should get their affairs in order. He made arrangements with his old friend, [O'Brien] in order to get wills drafted. The wills were as I've described to Your Honor, mirror wills.

"On two days before the marriage, September 1, Thursday, they went up to [O'Brien's] office. They conversed about the upcoming wedding. Everyone

The admission of certain evidence was undisputed, namely, the will, the marriage certificate of the decedent and the defendant, and the decedent's death certificate. The trial court denied the plaintiff's motion in limine with respect to the evidence that Thomas Mehring, Christopher Mehring, Maureen Mehring and Kathleen Mehring, who were named beneficiaries in the will, are the children of the defendant. The court granted the motion in limine, however, with respect to any other evidence regarding the decedent's intent.

was aware that the wedding was going to take place, [O'Brien], [the decedent] and his spouse and they executed the wills. During the course of the execution of the wills not only were, there was never a word concerning the fact that a marriage on Saturday might act to revoke a will that was executed on Thursday.

"They did marry on September 3. [O'Brien] was a guest at their wedding. They did fly to Ireland the next day for their honeymoon. They lived happily until June of 1995.

"On June 23, 1995, [the decedent] underwent an operation. Following the operation he was told that he had terminal cancer and was going to die. He was fully aware of that.

"She was not present during the first meeting of [O'Brien] with [the decedent] at the hotel. I'm sorry, at the hospital. She was present during the second meeting on February 8, 1996. She, like, [O'Brien] would testify that much of the conversation that day was the kind of conversation one would expect between a friend and his friend who was dying, but they also made arrangements with respect, made more practical arrangements with respect to [the decedent's] upcoming death. The will was retrieved. It was reviewed. [O'Brien] assured [the decedent] that his entire estate would pass to his widow.

"He then requested, she would testify as [O'Brien] did, that he then requested him to set up a corporation in which the stock would be owned, 13 percent of the stock would be owned by each of his daughters. [O'Brien] did that and distributed the stock to them and as a result, obviously, a corporation in which this kind of proceeding that we're involved in now is in the background, is not going to be successful.

"And so [the defendant] then paid each of the children, each of [the decedent's] daughters one hundred thousand dollars apiece for their stock. [She] would testify that because of certain concerns that [the decedent] had about his daughters that he wanted to set up the corporation in the particular way that he set it up and that this was his specific intention with respect to taking care of his daughters after his death.

"If I could have one more minute. And with that offer of proof, may it please the court, I rest my rebuttal of the case."

With respect to the other issue at trial, namely, whether the decedent's will provided for the contingency of his marriage to the defendant, the trial court, in a de novo proceeding, concluded that the Probate Court properly had admitted the will to probate because the will provided for the contingency of marriage. The trial court reasoned that "[the decedent's] will bequeathed all of his estate to the woman he was licensed to marry and did marry two days later. In his will, he named her executrix and designated her the guardian of his daughters, whose mother had previously died. The nature of these provisions, coupled with the extreme closeness in time of the marriage constitutes clear and convincing evidence of provision for the contingency of marriage. It would be preposterous to assume that [the decedent] was instead executing a will to make provisions that were to be revoked two days later." Accordingly, the trial court rendered judgment affirming the Probate Court's judgment admitting the will, and denied the plaintiff's appeal. This appeal followed.

The plaintiff claims that because the will did not expressly provide for the contingency of marriage, the trial court improperly concluded that the decedent's will provided for the contingency of marriage and, therefore, that his subsequent marriage did not automatically revoke his will under § 45a-257 (a). The plaintiff argues that in determining whether a will provides for contingency of a subsequent marriage, the court may consider only the language of the will, and that the will in question in this case does not include any language referring to the contingency of marriage, such as "the words 'if I marry,' 'when I marry,' 'my future wife' or even 'my fiancee.' In fact the words 'wife,' 'spouse' and 'marry' do not appear within the four corners of the will."

In contrast, the defendant claims that the trial court improperly excluded extrinsic evidence of the decedent's intent establishing that his subsequent marriage to her would not result in the revocation of his will.[9] In the alternative, the defendant argues that there is sufficient language within the will itself, without resort to extrinsic evidence, to indicate that the decedent did not intend for his will to be revoked upon his marriage to her.

We conclude that the will, in and of itself, did not provide for the contingency of the subsequent marriage of the decedent and, therefore, under existing case law, properly would have been revoked by that marriage pursuant to § 45a-257 (a). We also conclude, however, that under the circumstances of this case, the trial court improperly excluded evidence of a mistake by the scrivener that, if believed, would permit a finding that the will provided for the contingency of marriage. We therefore reverse the judgment of the trial court and order a new trial in which such evidence may be considered by the trial court.

On the basis of existing case law, the question of whether a will provides for the contingency of a subsequent marriage must be determined: (1) from the language of the will itself; and (2) without resort to extrinsic evidence of the testator's intent.[10] *Fulton Trust*

---

[9] The defendant presents her claim as part of a cross appeal. Technically, however, her claim is not properly part of a cross appeal because the defendant was not aggrieved by the judgment of the trial court. Rather, it is a claim concerning an adverse ruling of the trial court that "should be considered on appeal in the event the appellant is awarded a new trial . . . ." Practice Book § 63-4 (a) (1) (B). Because we conclude that, on the basis of existing case law, the plaintiff would have been entitled to reversal of the trial court's judgment, and because we conclude that, on the basis of the new case law that we articulate herein, a new trial must be granted, we consider the defendant's evidentiary claim.

[10] One exception to this rule of evidentiary exclusion is that extrinsic evidence may be admitted to prove a testator's intent where the language of the will is ambiguous. See, e.g., *Fulton Trust Co.* v. *Trowbridge*, 126

*Co.* v. *Trowbridge,* 126 Conn. 369, 372, 11 A.2d 393 (1940) (execution of will followed by adoption of child; no language in will providing for such contingency); *Strong* v. *Strong,* 106 Conn. 76, 79–80, 137 A. 17 (1927) (execution of will followed by birth of child; no language in will providing for such contingency); cf. *Czepiel* v. *Czepiel,* 146 Conn. 439, 442, 151 A.2d 878 (1959) (language in will provided for possible subsequent marriage); *Blake* v. *Union & New Haven Trust Co.,* 95 Conn. 194, 196–97, 110 A. 833 (1920) (language in will provided for subsequent birth of child). Applying this standard, we conclude that the trial court should not have admitted the will because, notwithstanding the inferences that the trial court drew from the dates of the marriage license and the will, and from the identity of certain of the named beneficiaries in the will, there was *no language in the will* providing for the contingency of the subsequent marriage of the decedent. Thus, this will fell on that side of the dividing line encompassing those wills that do not, in and of themselves, provide for such a contingency; see *Fulton Trust Co.* v. *Trowbridge,* supra, 372; *Strong* v. *Strong,* supra, 80; and beyond that side of the line encompassing those wills that do provide for such a contingency. See *Czepiel* v. *Czepiel,* supra, 440; *Blake* v. *Union & New Haven Trust Co.,* supra, 196.

This conclusion does not, however, end our inquiry in this case. In *Connecticut Junior Republic* v. *Sharon Hospital,* 188 Conn. 1, 2, 448 A.2d 190 (1982), this court considered the issue of "whether extrinsic evidence of a mistake by a scrivener of a testamentary instrument is admissible in a proceeding to determine the validity of the testamentary instrument." In a three to two decision, this court held that such evidence is not admissible. Id., 9. Upon further consideration, we now conclude that the reasons given by the dissent in that case are

Conn. 369, 372, 11 A.2d 393 (1940). The defendant does not claim, however, that the language of the will in the present case was ambiguous.

persuasive and apply to the facts of the present case. We, therefore, overrule *Connecticut Junior Republic*, and hold that if a scrivener's error has misled the testator into executing a will on the belief that it will be valid notwithstanding the testator's subsequent marriage, extrinsic evidence of that error is admissible to establish the intent of the testator that his or her will be valid notwithstanding the subsequent marriage. Furthermore, if those two facts, namely, the scrivener's error and its effect on the testator's intent, are established by clear and convincing evidence, they will be sufficient to establish that "provision has been made in such will for such contingency," within the meaning of § 45a-257 (a).

In *Connecticut Junior Republic* v. *Sharon Hospital*, supra, 188 Conn. 9, this court reasserted the familiar rule that, although extrinsic evidence is not admissible to prove an intention not expressed in the will itself or to prove a devise or bequest not contained in the will, such evidence is admissible to identify a named devisee or legatee, to identify property described in the will, to clarify ambiguous language in the will, and to prove fraud, incapacity or undue influence. In rejecting the claim that extrinsic evidence should also be admissible to prove a scrivener's error, the majority relied principally on our existing case law and on the risk of subverting the policy of the statute of wills. Id., 23 (*Peters, J.*, dissenting). The majority acknowledged, however, that, as with any rule of law, time and experience could persuade to the contrary. "[P]rinciples of law which serve one generation well may, by reason of changing conditions, disserve a later one. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." (Citations omitted; internal quotation marks omitted.) Id., 17–18. We are now persuaded to the contrary.

The dissent in that case by Justice Peters and joined by Justice Shea, concluded that it "would permit extrinsic evidence of a scrivener's error to be introduced in litigation concerned with the admissibility of a disputed will to probate." Id., 22. The dissent gave three principal reasons for its conclusion, each of which we consider to be persuasive and each of which applies to this case. See id., 22–26.

First, given that extrinsic evidence is admissible to prove that a will was executed by the testator "in reliance on erroneous beliefs induced by fraud, duress, or undue influence"; id., 22; there is no discernible policy difference between that case and a case in which "a will is executed in reliance on erroneous beliefs induced by the innocent error, by the innocent misrepresentation, of the scrivener of a will." Id., 23. In each instance, "the testamentary process is distorted by the interference of a third person who misleads the testator into making a testamentary disposition that would not otherwise have occurred." Id., 22–23. "In each instance, extrinsic evidence is required to demonstrate that a will, despite its formally proper execution, substantially misrepresents the true intent of the testator." Id., 23.

Similarly, in the present case, there is no discernible policy difference between extrinsic evidence offered to show fraud, duress or undue influence, and extrinsic evidence offered to show that a scrivener's error induced the decedent to execute a will that he believed would survive his subsequent marriage. In both instances, the testamentary process was distorted by the interference of a third person who misled the testator into executing a will that would not otherwise have been executed—in the present case, a will that would be revoked upon his marriage because it did not contain language providing for the contingency of marriage. Thus, as in the case of fraud, duress or undue influence, extrinsic evidence is required to demonstrate that the

will that the testator executed did not substantially state his true intention.[11]

Second, the dissent recognized that, based on the policy of the statute of wills, the "risk of subversion of the intent of a testator, who cannot personally defend his testamentary bequest, is without doubt a serious concern." Id., 24. The dissent, however, persuasively underscored the counterbalancing "risk of blindly enforcing a testamentary disposition that substantially misstates the testator's true intent." Id. Again drawing on the analogy to the case of fraud, duress or undue influence, the dissent stated that "[h]ad the decedent's lawyer deliberately and fraudulently altered the second codicil, the relevant extrinsic evidence would unquestionably have been admitted." Id., 25. The dissent contended that "innocent misrepresentation is treated as generally equivalent to fraud in terms of its legal consequences." Id. Therefore, the dissent asserted, the "[s]tatute of [w]ills does not compel enforcement of testamentary dispositions that a testator never intended to make." Id.

Similarly, in the present case, had the decedent's attorney deliberately and fraudulently, rather than innocently but mistakenly, misrepresented to the decedent that his will would be valid despite his subsequent marriage, it is at least arguable that the beneficiaries of that fraudulent conduct, namely, the heirs-at-law of the decedent who would inherit in the event of his intestacy, would not be permitted to take advantage of that fraud, and that a court of equity could impress a constructive trust on their inheritance. We conclude that, analogously, in this case, the extrinsic evidence should be admissible to establish the decedent's true intent.

[11] We acknowledge that permitting extrinsic evidence of a scrivener's error will lead to the introduction of extrinsic evidence of intent, which, as we noted previously, is not permitted. For the reasons discussed herein, this common-law exception is no different, however, from the extrinsic evidence of intent permitted in cases alleging fraud, undue influence and duress.

Third, the dissent examined and rejected the two main objections to the admission of extrinsic evidence of a scrivener's error. One objection was "that whatever error the scrivener may have made was validated and ratified by the testator's act in signing his will." Id., 26. The dissent responded, correctly in our view, that, although "signing [a] will creates a strong presumption that the will accurately represents the intentions of the testator, that presumption is a rebuttable one." Id. Similarly, in the present case, although the fact that the decedent signed the will may create a rebuttable presumption that he did not intend it to survive his subsequent marriage, that presumption should be rebuttable by persuasive extrinsic evidence to the contrary.

The other objection was "that allowing extrinsic evidence of mistake will give rise to a proliferation of groundless will contests." Id. The dissent presented a two part response, with which we also agree. First, it noted that, "[i]n the law of contracts, where the parol evidence rule has undergone considerable erosion, this risk has not been found to have been unmanageable. In the law of wills, the risk is limited by the narrowness of the exception that this case would warrant . . . [namely, to] permit the opponent of a will to introduce extrinsic evidence of the error of a scrivener, and [to] require proof of such an extrinsic error to be established by clear and convincing evidence." Id., 26–27

Similarly, in the present case, the admissibility of such extrinsic evidence, in our view, will not prove to be any less manageable than in cases of parol evidence in contract disputes. Furthermore, we would impose the same elevated burden of proof on the proponent of the will in a case such as this. The proponent would have to establish the scrivener's error by clear and convincing evidence.

We recognize that the dissent's position in *Connecticut Junior Republic* would have resulted in the consideration of extrinsic evidence of a scrivener's error offered for the purpose of *preventing* admission of a testamentary document to probate, rather than for the purpose of *procuring* such admission, as in the present case. Regardless of that distinction, however, the mistake doctrine advocated by the dissent in *Connecticut Junior Republic* applies equally to the present case. The dissent in *Connecticut Junior Republic* phrased the issue in that case as follows: "Must the true intent of the testator be thwarted when, because of the mistake of a scrivener, he has formally subscribed to a written bequest that substantially misstates his testamentary intention?" Id., 22. That is precisely the issue in the present case. The dissent in *Connecticut Junior Republic* answered that question in the negative, recognizing that evidence of a scrivener's mistake should be admissible where offered to establish that a written bequest *should not be admitted* to probate because its execution was the product of a mistake of the scrivener and, therefore, did not embody the disposition intended by the testator. Id., 22–23. Likewise, in the present case, evidence of a scrivener's mistake should be admissible to establish that a written bequest *should be admitted* to probate because the disposition provided by the bequest would have obtained, in accordance with the decedent's intent, but for the scrivener's mistake.

Finally, we address one other consideration that was not present in *Connecticut Junior Republic*, which might be perceived to be present in this case. That is the potential for past reliance by testators on our prior case law. We do not believe that this is a persuasive consideration. It is very unlikely that, in reliance on such case law, any testators executed wills and deliberately omitted language providing for the contingency of marriage in order to be sure that their wills would be

revoked by a subsequent marriage. Moreover, it is very unlikely that any testators, having married after executing such wills, deliberately did not make new testamentary dispositions in reliance on the proposition that their prior wills had been revoked by that subsequent marriage.

Applying these principles to the facts of the present case, we conclude that the extrinsic evidence offered, if believed, could prove clearly and convincingly that there was a scrivener's error that induced the decedent to execute a will that he intended to be valid despite his subsequent marriage. The offer of proof indicates that the evidence would be susceptible to an inference by the fact finder that there had been an implied assertion by the scrivener that the will would be valid despite the decedent's subsequent marriage. This inference could have been bolstered, moreover, by the evidence of the conversations between the decedent and the scrivener shortly before the decedent's death.

The judgment is reversed and the case is remanded for a new trial.

In this opinion KATZ, PALMER and PETERS, Js., concurred.

BERDON, J., concurring. Although I have some reservation with identifying the error on the part of the attorney as a "scrivener's error" in this case, I concur in the result reached by the majority. More specifically, I agree that *Connecticut Junior Republic* v. *Sharon Hospital*, 188 Conn. 1, 448 A.2d 190 (1982), should be overruled. Justice Peters' dissent in *Connecticut Junior Republic*, as joined by Justice Shea, points out that the opponent of a will should be allowed "to introduce extrinsic evidence of the error of a scrivener, and [that] . . . proof of such an extrinsic error [must] be established by clear and convincing evidence." Id., 26–27. Although "antiquity does not automatically disqualify

common law precedents"; id., 23 (*Peters, J.*, dissenting); our law should serve modern needs.