[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a probate appeal on remand from the Supreme Court for a new trial. The dispute in this case grows out of former General Statutes (Rev. To 1995) § 45a-257 (a), which provided: "If, after the making of a will, the testator marries . . . and no provision has been made in such will for such contingency, such marriage . . . shall operate as a revocation of such will . . . ."
The basic facts and procedural background of the case have already been well stated by the Supreme Court: "On September 1, 1988, the decedent ("Erickson") executed a will. At that time, he had three daughters and was unmarried. Two days later, on September 3, 1988, he married Dorothy Mehring ("Mehring"). He died on February 22, 1996.
"The six articles of the . . . will provides as follows. The first article provides for the payment of funeral expenses and debts by the estate. The second article states that the residue of the estate will pass to Mehring. The third article provides that if Mehring predeceases the decedent, one half of the residuary estate will pass in equal parts to the decedent's three daughters, Laura Erickson Kusy, Ellen Erickson Cates and Alicia Erickson, the plaintiff in this case, and one half of the residuary estate will pass in equal parts to Thomas Mehring, Christopher Mehring, Maureen Mehring and Kathleen Mehring, the children of Mehring.. The fourth article appoints Mehring as the executrix of the will, with Attorney Robert O'Brien as the contingent executor in the event that Mehring is unable to or refuses to serve as executrix. The fifth article gives the executrix or executor the power to dispose of property of the estate as necessary. The sixth article appoints Mehring as the guardian of any of the decedent's children who have not reached the age of eighteen at the time of his death.
"The Probate Court admitted the decedent's will to probate. The plaintiff appealed from the Probate Court's judgment. Prior to the original trial, the plaintiff filed a motion in limine to exclude extrinsic evidence of the decedent's intent. The plaintiff argued that [§] 45a-257 makes the Court's inquiry very simple: to determine whether the will was revoked, the Court need examine only [the decedent's] will, his marriage certificate to [the defendant], and his death certificate. Extrinsic evidence CT Page 14408 regarding [the decedent's] intentions is inadmissible because the language of [the decedent's] will is unambiguous, and therefore under . . . [§] 45a-257 the operation of the marriage to revoke the will is automatic and mandatory.' Mehring, now executrix of the will, in opposition to the plaintiffs motion, made a detailed offer of proof to show the contrary intent of the decedent.
"The admission of certain evidence was undisputed, namely, the will, the marriage certificate of the decedent and Mehring, and the decedent's death certificate. The trial court denied the plaintiffs motion in limine with respect to the evidence that Thomas Mehring, Christopher Mehring, Maureen Mehring and Kathleen Mehring, who were named beneficiaries in the will, are the children of the defendant Mehring. The court granted the motion in limine, however, with respect to any other evidence regarding the decedent's intent.
"With respect to the other issue at trial, namely, whether the decedent's will provided for the contingency of his marriage to Mehring, the trial court, in a de novo proceeding, concluded that the Probate Court properly had admitted the will to probate because the will provided for the contingency of marriage. The trial court reasoned that `[the decedent's] will bequeathed all of his estate to the woman he was licensed to marry and did marry two days later. In his will, he named her executrix and designated her the guardian of his daughters, whose mother had previously died. The nature of these provisions, coupled with the extreme closeness in time of the marriage constitutes clear and convincing evidence of the provision for the contingency of marriage. It would be preposterous to assume that [the decedent] was instead executing a will to make provisions that were to be revoked two days later.' Accordingly, the trial court rendered judgment affirming the Probate Court's judgment admitting the will, and denied the plaintiffs appeal." Erickson v. Erickson,246 Conn. 359, 362-69, 716 A.2d 92 (1998).
On appeal, the Supreme Court reversed the trial court and held that "the will, in and of itself, did not provide for the contingency of the subsequent marriage of the decedent and, therefore, under existing case law, properly would have been revoked by that marriage pursuant to § 45a-257 (a). . . . On the basis of existing case law, the question of whether a will provides for the contingency of a subsequent marriage must be determined: (1) from the language of the will itself; and (2) CT Page 14409 without resort to extrinsic evidence of the testator's intent. . . . Applying this standard, we conclude that the trial court would not have admitted the will because, notwithstanding the inferences that the trial court drew from the dates of the marriage license and the will, and from the identity of certain of the named beneficiaries in the will, there was no language inthe will providing for the contingency of the subsequent marriage of the decedent." (Emphasis in original; citations omitted.)Erickson v. Erickson, supra, 246 Conn. 370-71.
The Supreme Court went on to state that "[t]his conclusion, does not, however, end our inquiry in this case. In ConnecticutJunior Republic v. Sharon Hospital, 188 Conn. 1, 2, 448 A.2d 190
(1982), this court considered the issue of `whether extrinsic evidence of a mistake by a scrivener of a testamentary instrument is admissible in a proceeding to determine the validity of the testamentary instrument.' In a three to two decision, this court held that such evidence is not admissible. . . . Upon further consideration, we now conclude that the reasons given by the dissent in that case are persuasive and apply to the facts of the present case. We, therefore, overrule Connecticut JuniorRepublic, and hold that if a scrivener's error has misled the testator into executing a will on the belief that it will be valid notwithstanding the testator's subsequent marriage. Furthermore, if those two facts, namely, the scrivener's error and its effect on the testator's intent, are established by clear and convincing evidence, they will be sufficient to establish that `provision has been made in such will for such contingency,' within the meaning of § 45a-257 (a)." Erickson v. Erickson,
supra, 246 Conn. 371-72.
The Supreme Court then remanded the case to this court for a new trial, stating that "the extrinsic evidence offered, if believed, could prove clearly and convincingly that there was a scrivener's error that induced the decedent to execute a will that he intended to be valid despite his subsequent marriage. The offer of proof indicates that the evidence would be susceptible to an inference by the fact finder that there had been an implied assertion by the scrivener that the will would be valid despite the decedent's subsequent marriage. This inference could have been bolstered, moreover, by the evidence of the conversations between the decedent and the scrivener shortly before the decedent's death." Id., 377.
The fact that the testator signed a will that lacked any CT Page 14410 provision for his subsequent marriage creates a strong presumption that he intended for the will to be revoked upon his marriage. "[A]lthough signing [a] will creates a strong presumption that the will accurately represents the intentions of the testator, that presumption is a rebuttable one." (Internal quotation marks omitted.) Erickson v. Erickson, supra,246 Conn. 375. In this case, "although the fact that the decedent signed the will may create a rebuttable presumption that he did not intend it to survive his subsequent marriage, that presumption should be rebuttable by persuasive extrinsic evidenced to the contrary." Id.
As indicated by the Supreme Court, the burden is on the proponents of the will to rebut the strong presumption that the decent intended for his will to be revoked. To do so, the proponents for admission of the will must prove a scrivener's mistake and its effect on the testator's intent by clear and convincing evidence. "[C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Internal quotation marks omitted.) Somers v. Statewide GrievanceCommittee, 245 Conn. 277, 290-91, 715 A.2d 712 (1998). "Although we have characterized this standard of proof as a `middle tier standard'. . . and as `an intermediate standard'. . . between the ordinary civil standard of a preponderance of the evidence, or more probably than not, and the criminal standard of proof beyond a reasonable doubt, this characterization does not mean that the clear and convincing standard is necessarily to be understood as lying equidistant between the two. Its emphasis on the highprobability and the substantial greatness of the probability of the truth of the facts asserted indicates that it is a very demanding standard. . . . We have stated that the clear and convincing evidence standard should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is loose, equivocal or contradictory.'" (Citations omitted; emphasis in original.) Miller v. Commissioner ofCorrection, 242 Conn. 745, 794-95, 700 A.2d 1108 (1997).
The plaintiff argues concerning the events prior to the CT Page 14411 execution of the will in 1988 "obscures any certain understanding of Erickson's real intent." By operation of the will not only does Mehring, a woman Erickson knew less than one year, get approximately what she brought to the estate at the time of the execution (about $700,000) but what was in the estate of Erickson's wife of twenty years, the gross taxable estate of $631,795.73 which was included in Erickson's estate of approximately $2-$3 million dollars. At the time of execution if Mehring survived him his teenage daughters at the time would have been disinherited. At the time of execution it cannot be clear and convincing that he would have intended such a result particularly as the will goes on to provide that the estate be split between each other's children upon a simultaneous death.
The defense offered two witnesses to conversations that the testator had at the time of execution: Robert O'Brien ("O'Brien"), the attorney who drew the will; and Mehring. They also testified to later conversations with the decedent tobolster the inference (emphasis added) requested of the finder of fact that the decedent intended to have the will survive the strong presumption to the contrary without the contingency of marriage. As discussed by the Supreme Court, the outcome of this case depends on the credibility of witnesses. Credibility that must be measured by such factors as motive, interest and relationship.
O'Brien was a construction lawyer with the firm of Gordon, Muir and Foley. He had represented Erickson on construction matters and had what he called built up a close personal relationship.
Sometime in August 1988 he received a call from Erickson to prepare wills for him and Mehring who he had met within the year and was to be married. O'Brien testified that Erickson informed him that he wanted to leave Mehring his entire estate. Erickson informed him he was leaving on the Concorde, a plane known to be of high speed, and in no way did they expect to leave without wills. O'Brien dealt directly with Erickson and never spoke to Mehring until the day the wills were executed. O'Brien directed a secretary in his firm to have simple wills drawn up for Erickson and Mehring. O'Brien's will file had a letter directed to Erickson dated August 5, 1988. O'Brien testified he reviewed the draft wills which were mailed for their review. He requested a call to arrange for the originals to be executed and also to discuss any questions which they may have. An appointment was set CT Page 14412 up to execute the wills two days before the wedding. The will file shows that the original wills were executed on September 1, 1988, 2 days before the marriage and mailed by certified mail, return receipt, on September 19, 1988. The addressees were Mr. 
Mrs. Ronald K. Erickson. The return receipt is signed only by Dorothy Erickson on 9/21/88. Other than a bill for $135, nothing is contained or noted in the will file pertaining to Erickson's intentions or other information customarily contained in a will file until death. The only two notes that relate to Erickson — "(1) Does he want Lois Peter Valerio as guardians?" Noted in red ink "C Yes"; and "(2) Would that apply even if Dorothy still lives?" In red ink "No". Plaintiff points out there were no notes in the will file to reflect two important conversations that O'Brien claims took place before Erickson died relating to the deposition of his property. O'Brien testified that in 1995 he learned that Erickson was in the hospital and had six months to live. When he visited him in the hospital Erickson asked him to review his will and make sure that his property would pass to his wife. O'Brien testified that the reason he did not discuss anything about the effect of the marriage on the validity of the wills is because he did not understand that marriage would act to invalidate the will. O'Brien claims although he spoke to Erickson by phone he did not see Erickson until February 8, 1996 when he visited him at home in Madison, Connecticut. Mehring was present during this visit. Erickson spoke to O'Brien about setting up a corporation for using lasers for food testing business that he was excited about and wanted his daughters to own 13% each of stock in the corporation. Nothing was said that Erickson expected that this stock in any way was a substitution for any inheritance. Erickson indicated that he had a partner in the business and that someday it would be worth a great deal of money. Such a consideration shortly before Erickson's death is contrary to the testimony of O'Brien and later other witnesses that he did not believe in leaving substantial sums of money to his children. O'Brien again asked if everything was alright with his will which Mehring had gotten for O'Brien that everything go to his wife.
The plaintiff points out (Post Trial Brief of Alicia Erickson, pages 6 and 7) that O'Brien's testimony regarding these conversations was inconsistent with his deposition taken only two months earlier "[before] the marriage that he did not want substantial sums of money to be simply handed to children or children who were in their twenties." Also that O'Brien said that he discussed Erickson's will with John Goodrich, an experienced CT Page 14413 estate lawyer that headed that department in the law firm. Goodrich denied ever speaking to O'Brien before the execution of the will. Plaintiff further points out that O'Brien's testimony regarding his conversations is inconsistent with his pleadings in a pending civil suit against him and his law firm for malpractice in this case brought by Mehring. Mehring seeks to recover the share of the estate which Erickson's daughters will take if the will is not admitted to probate. Further, O'Brien could not remember what was discussed in an eighteen minute conversation with a paralegal just before the preparation of Exhibit 1, which is the application for the admission of the will, Form (PC 200 Rev. 7/94). That box providing that the decedent was married after the making of the will is not "Xed" (left blank). The plaintiff emphasized during trial the importance of the unmarked box that the court should consider as to the credibility of both O'Brien and Mehring in this case. O'Brien could not recall the contents of his conversation between him and Mehring on February 28, 1996 just prior to Mehring's signature. The plaintiff argues that O'Brien's memory as to earlier conversations is better about those he had before the execution of the will and before the death of Erickson than his latest conversations with is paralegal or Mehring because he faces the malpractice suit.
O'Brien's testimony and inconsistent statements illustrate O'Brien's conflicts of interest in this case. Plaintiff points out his faulty memory that casts doubt upon his reliability as a witness. (See fn. 7 Post Trial Brief of Alicia Erickson, page 9).[1]
Mehring testified that in 1988 and in months leading up to Erickson's death, the decedent had told her of his intention to leave his entire estate to her. However, as in the case of O'Brien, the plaintiff points out multiple reasons to question the credibility of Mehring. Mehring's honesty was called into question by substantial evidence that she had forged the plaintiffs signature on the application to probate the will of the plaintiffs mother. Mehring acknowledged that she might have signed the name to the application if the decedent had asked her to. She also failed to mark the box on the signed application to probate the decedent's will indicating that the decedent had married after executing his will. Such an oversight is more likely intentional than inadvertent.
The Probate Court clerk testified that copies of the will and death certificate were submitted by Mehring with the application CT Page 14414 but no document indicating the date of marriage. The date of marriage came to the attention of the Probate Court when Ms. Lougee, the clerk, on her own checked through the town clerk's office. Attorney Goodrich never saw the application before it was filed with the Probate Court testified to by Ms. Anest, the paralegal of the firm. There was inconsistent testimony between O'Brien and Anest, the paralegal, as to what was said for 18 minutes before the preparation of Exhibit 1 and the unmarked box in PC Form 200. Mehring testified she was in a blur because of Erickson's death when she signed the application yet she wasn't in a blur about a week before, the day Erickson died, when she signed the incorporation papers for Sovereign Electric in which the decedent wanted his daughters to receive 39%. Ms. Anest who drafted the application was a paralegal of probate matters for at least a hundred application forms. The will file had a note "September 3, 1988 wedding". She knew all these facts and it is somewhat doubtful that she would not have asked O'Brien or Goodrich concerning a disclosure of a fact which may have resulted in invalidating the will.
Looking beyond the testimony of O'Brien and Mehring there was other testimony of other witnesses as to the testator's statements in months leading up to his death in 1996 that he wanted to leave his estate to his wife. The other witnesses offered were Mehring's brother, Mehring's son-in-law, and a neighbor of Mehring. All the witnesses had a motive and interest in the outcome of this matter and gave little support for the court to reach a conclusion by clear and convincing evidence the intent of the decedent at the time he executed his will.
The testimony of O'Brien and Mehring fraught with all of these difficulties discussed is the kind of loose equivocal and contradictory evidence that cannot establish clear and convincing proof. Consequently their testimony has failed to overcome the strong presumption that the testator intended for his will to be revoked by his marriage.
As the Supreme Court has stated, the "inference that there had been an implied assertion by the scrivener that the will would be valid despite the decedent's subsequent marriage . . .could have been bolstered . . . by the evidence of the conversations between the decedent and the scrivener shortly before the decedent's death." (Emphasis added.) Id., 377. The evidence of conversations after the execution, then may be used as additional support for the defendant's position in conjunction CT Page 14415 with other evidence establishing an inference that the testator intended for his will not to be revoked; but the evidence of the later conversations, standing alone, does not establish that intention by clear and convincing evidence. Indeed, the tailored testimony regarding the testator's conversations in the period leading up to his death indicates that the testator was then referring to his intentions at that time rather than his intentions in 1988 when he executed his will, it is difficult to see how this evidence, standing alone, could prove his intention in executing the will by clear and convincing evidence. "[T]he intention of the testator, which is the controlling factor in construing the will, is the intention which he has when he executes the will. . . ." W. Bowe D. Parker, Page on Wills (1960), § 30.26, p. 160. While evidence of the testator's intent in 1995 or 1996, under the Supreme Court's opinion, could be used to bolster the inference created by other evidence of the testator's intent in 1988, the evidence of the later conversations, taken by itself, is too remote from the execution of the will to create that inference by clear and convincing evidence.
Finally, the defendant continues to argue that this case may be decided by looking at just the will, the marriage certificate, and the death certificate. This was the approach taken by this court at the first trial in entering judgement for the defendant. That judgment was, of course, reversed by the Supreme Court.
For the foregoing reasons, the defendant has not convinced this court by clear and convincing evidence that it has rebutted the strong presumption that the decedant intended for his will to be revoked by his subsequent marriage. Consequently, the appeal is sustained and the estate of Ronald Erickson be distributed according to the laws of intestacy.
Frank S. Meadow, Judge Trial Referee