HELEN M. FLANNERY & another[1] *vs.* PAUL J. MCNAMARA,
administrator,[2] & others.[3]

Middlesex. September 7, 2000. - November 21, 2000.

Present: ABRAMS, GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Will,* Construction, Extrinsic evidence, Mistake. *Devise and Legacy,* Extrinsic
evidence affecting construction.

Discussion of the law regarding construction of a will, patent and latent
ambiguities therein, and extrinsic evidence as such might create or resolve
any ambiguity. [667-673]
This court declined to authorize the admission of extrinsic evidence offered to
construe a will that was not ambiguous in its terms. [673] GREANEY, J.,
concurring, with whom ABRAMS, J., joined.
Discussion of the law of reformation of wills. [673-674]
This court declined to allow the reformation of the unambiguous terms of a
will to conform the text to the testator's alleged intent suggested by
extrinsic evidence. [674-677] GREANEY, J., concurring, with whom ABRAMS,
J., joined.

CIVIL ACTION commenced in the Middlesex Division of the
Probate and Family Court Department on November 25, 1997.

The case was heard by *Dorothy M. Gibson,* J., on motions for
summary judgment.

The Supreme Judicial Court granted an application for direct
appellate review.

*George A. Page, Jr. (Andrea C. Dow* with him) for the
plaintiffs.

*Thomas J. Ford (Peter G. Cary* with him) for Lorraine M.
Daley & others.

IRELAND, J. The plaintiffs, Helen M. Flannery and Margaret
M. Moran (Flannerys), filed a complaint against the defendants,
Paul J. McNamara, administrator of the estate of William H.

---

[1]Margaret M. Moran.

[2]Of the estate of William H. White, Jr.

[3]Lorraine M. Daley, William F. Daley, Delores Donga, Suzanna Sawyer,
Marilyn Wasik, and Joan Williamson.

White, Jr. (decedent), and the decedent's heirs, the Daleys and the Whites (heirs), seeking declaratory relief and reformation of the decedent's will. The Flannerys alleged that they, and not the heirs, are the rightful beneficiaries under the will. The heirs filed motions to dismiss the complaint, pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), for failure to state a claim on which relief can be granted. By agreement of the parties, the judge subsequently treated the rule 12 (b) (6) motions as motions for summary judgment, under Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974).

The judge granted the heirs' motions for summary judgment, ruling that, because the will was unambiguous on its face, extrinsic evidence of the decedent's alleged intent was inadmissible. Moreover, she held that, because the will did not provide for disposition of the decedent's property in the event his wife predeceased him, his property passed to the heirs by way of intestacy.

Subsequently, the Flannerys appealed from the Probate Court's grant of summary judgment for the heirs. We granted their application for direct appellate review. The Flannerys argue that the Probate Court judge erred by holding inadmissible extrinsic evidence that might persuade the court to (1) construe or (2) reform a poorly drawn will, albeit unambiguous on its face, to reflect the decedent's intent, thereby avoiding unjust enrichment.

This appeal presents the question whether we should overrule (1) the so-called "plain meaning" rule that prohibits the admission of extrinsic evidence to construe unambiguous wills; and (2) the rule prohibiting the reformation of wills.[4] We decline to do so, and thus, affirm the Probate Court's decision.

1. *Statement of Facts.*

On September 30, 1995, the decedent died in Arlington. The decedent's will, dated January 20, 1973, left his entire estate to his wife, Katherine M. White (Katherine). The relevant part of the will provides that:

"I give, devise, and bequeath all of the property of which I die possessed real, personal, and mixed of

---

[4]The parties also debate whether the Flannerys were legatees under the decedent's will for the purposes of applying the provisions of G. L. c. 197, § 19, a procedural statute of limitations. In light of our decision in this case, we need not resolve the issue.

whatsoever nature and wheresoever located to my beloved wife, Katherine M. White."

The decedent's will failed to name a contingent beneficiary and it did not contain a residuary clause.

Katherine died October 14, 1993, survived by the decedent and her two sisters, the Flannerys. The couple had no children. McNamara, the decedent's attorney, repeatedly advised the decedent to let him review the will, but the decedent never showed the will to McNamara. The decedent died survived by his intestate heirs who were discovered through a genealogical search. The heirs are the decedent's first cousins, once removed.

The Flannerys make the following allegations. For almost five decades, they had a close relationship with the decedent. Moreover, after Katherine's death, the decedent relied heavily on the Flannerys for advice and assistance with daily matters. After the decedent died, he was buried in the Flannerys' family plot. On several occasions, the decedent told members of the Flannerys' family that his Arlington residence and its contents "will be [theirs] some day." Additionally, the decedent informed McNamara that he understood that, if Katherine were to predecease him, his will provided for his property to go to the Flannerys. In contrast, the decedent did not have a close relationship with the heirs.

After the decedent died in 1995, McNamara was appointed administrator of the decedent's estate. He received the decedent's will for probate and was preparing to distribute the estate to the heirs by way of intestate succession, when the Flannerys filed for declaratory relief and reformation of the will on November 25, 1997.

2. *Discussion.*

The Flannerys claim that, although the decedent's will made no mention of them, he intended to pass his estate to them in the event that Katherine predeceased him. Specifically, the Flannerys contend that the portion of the will that reads, "all . . . to my beloved wife, Katherine M. White," should be either construed or reformed to read, "all . . . to my beloved wife, Katherine M. White, if she survives me, but if not, then to her sisters who survive me," namely, the Flannerys. We disagree.

a. *Construction.* "The fundamental object in the construction of a will is to ascertain the testator's intention from the whole instrument, attributing due weight to all its language, considered

in light of the circumstances known to the testator at the time of its execution, and to give effect to that intent unless some positive rule of law forbids." *Putnam* v. *Putnam,* 366 Mass. 261, 266 (1974). See *Fitts* v. *Powell,* 307 Mass. 449, 454 (1940); *Best* v. *Berry,* 189 Mass. 510, 512 (1905).

Here, the Flannerys assert that the decedent intended to name them as the beneficiaries of his estate in the event that his wife predeceased him. To prove this, the Flannerys seek to introduce extrinsic evidence of their relationship with the decedent and the decedent's statements concerning his intent.

Under current Massachusetts law, however, "[i]f a will is not ambiguous, extrinsic evidence to explain its terms is inadmissible . . . even where the language involved has a legal consequence either not likely to have been understood by the testator . . . or contrary to his intention expressed orally" (citations omitted). *Putnam* v. *Putnam, supra.* See *Gustafson* v. *Svenson,* 373 Mass. 273, 275 (1977) (extrinsic evidence of testatrices' alleged intent inadmissible where will, in particular the phrase "his heirs per stirpes," unambiguous). Thus, extrinsic evidence of the decedent's alleged intent is only admissible if his will is ambiguous. See *Mahoney* v. *Grainger,* 283 Mass. 189, 192 (1933) ("It is only where the testamentary language is not clear in its application to the facts that evidence may be introduced as to the circumstances under which the testator used that language in order to throw light upon its meaning"); *Moffatt* v. *Heon,* 242 Mass. 201, 205 (1922); *Best* v. *Berry, supra.* The will before us is not ambiguous.

First, the decedent's will contains no patent ambiguities. A patent ambiguity is one created by obvious conflicts in the language of the will itself. *Treadwell* v. *Cordis,* 5 Gray 341, 357 (1855). See Smith, The Admissibility of Extrinsic Evidence in Will Interpretation Cases, 64 Mass. L. Rev. 123, 124 (1979). The decedent's will unequivocally states "all . . . to my beloved wife, Katherine M. White." No conflict or inconsistency arises from such clear and plain language.

Second, the will contains no latent ambiguities. A latent ambiguity emerges when the words of a will appear to be unambiguous on their face, but certain extrinsic facts render their meaning uncertain. *Phipps* v. *Barbera,* 23 Mass. App. Ct. 1, 3 n.3 (1986), citing Smith, *supra.* There are two types of latent ambiguities. "The first type occurs when a will clearly describes a person or thing, and two or more persons or things

exactly fit that description. The second type of latent ambiguity exists when no person or thing exactly fits the description, but two or more persons or things partially fit." *Phipps* v. *Barbera, supra*. Neither type of ambiguity exists here. Indeed, there is only one person fitting the description of "my beloved wife, Katherine M. White," namely, the decedent's wife, Katherine. Moreover, Katherine alone fit that description exactly. Neither the fact that she predeceased the decedent, nor the absence of a residuary clause or a contingent beneficiary provision, makes the will ambiguous. Long before the decedent's execution of his will in 1973, it was settled law that, when a beneficiary predeceases the testator, the legacy lapses and falls into residue if there is one; otherwise it must pass as intestate property. See *Bray* v. *Bray,* 359 Mass. 439, 441 (1971); *Worcester Trust Co.* v. *Turner,* 210 Mass. 115, 121 (1911); *Dresel* v. *King,* 198 Mass. 546 (1908). See also 2 G. Newhall, Settlement of Estates § 33:51 (5th ed. 1997). As such, the will contains no latent ambiguity.

The Flannerys, however, argue that extrinsic evidence is admissible to create a latent ambiguity. The Flannerys seek to show, through extrinsic evidence, that the decedent had a "personal usage" of the will's language that differed from its plain, commonly accepted usage, and that the will should be construed consistently with this usage. They specifically want to demonstrate that the plain language of the will, "to my beloved wife," was actually intended and understood by the decedent to mean, "to my wife if she survives me, but if not, then to her sisters who survive me."

Generally, we have flatly rejected the idea that extrinsic evidence may be used to create an ambiguity where the language of the will is otherwise plain and unambiguous. See *Pagliarulo* v. *National Shawmut Bank,* 353 Mass. 449, 450 (1968); *Whitbeck* v. *Aldrich,* 341 Mass. 326, 329 (1960); *Keith* v. *Worcester County Trust Co.,* 338 Mass. 41, 43 (1958) ("Extraneous matters cannot be used to create an ambiguity not manifest in the document being construed"). See also *Smith, supra.* Indeed, "[i]t is not an aid to interpretation to resort to testimony as to what may have been in the testator's mind in order to create an ambiguity not evident from the language of the will." *Pagliarulo* v. *National Shawmut Bank, supra.* Furthermore, we have traditionally rejected this type of "personal usage" argument proffered by the Flannerys. See *Gustafson* v. *Svenson, supra* at

275 (extrinsic evidence inadmissible when offered to prove testatrices intended the term "heirs," as used in their wills, not to include specific individual who qualified legally as heir). See also *Putnam* v. *Putnam, supra* at 266-267.

Nonetheless, in support of their position, the Flannerys rely on *Dansereau* v. *Dansereau,* 318 Mass. 363 (1945); *Sullivan* v. *Sullivan,* 26 Mass. App. Ct. 502 (1988); and Restatement (Third) of Property (Donative Transfers) § 11.2(b)(3) (Tent. Draft No. 1, 1995) (Restatement). However, each of these authorities is distinguishable.

In *Dansereau* v. *Dansereau, supra,* the admissibility of extrinsic evidence was not at issue. There was, however, a legitimate question as to how properly to construe the will. *Id.* at 364. "Uncertainty as to its construction" arose when the testator was predeceased by the intended life beneficiary of the testator's estate. *Id.* Due to poor draftsmanship and "[confused] grammatical construction," it was unclear whether the estate would pass by intestacy or to the individuals named as remainderpersons. *Id.* at 365. This court applied the so-called presumption against intestacy,[5] and using what is referred to as a "settled" rule of construction — "a transposition of clauses . . . where upon the whole will that appears to accord with the intention of the testator" — construed the will as leaving the estate to the remainderpersons. *Id.*

---

[5]In further support of their claim, the Flannerys rely on this presumption, under which "a construction of a will resulting in intestacy is not to be adopted unless plainly required; and it is to be presumed that when a will is made the testator intended a disposition of all his property and did not intend to leave an intestate estate." *Lyman* v. *Sohier,* 266 Mass. 4, 8 (1929). See *Old Colony Trust Co.* v. *Treadwell,* 312 Mass. 214, 216 (1942). However, as a rule of construction, the presumption only applies when the court can ascertain from the face of the will how the testator intended that his or her property be distributed. *Boston Safe Deposit & Trust Co.* v. *Schmitt,* 349 Mass. 669, 672-673 (1965). Notwithstanding the presumption, it is well settled that a testator's estate passes by intestacy when the plain language of the will requires such a result. *Id.* For example, when the testator has failed to anticipate an event that has transpired (such as the named beneficiary predeceasing the testator), and the face of the document does not indicate how the testator would have distributed the property had he or she foreseen that event, the presumption would not apply. See *id.*; *National Shawmut Bank* v. *Zink,* 347 Mass. 194, 196 (1964) (although presumption against intestacy exists in some instances, "it is equally true that we cannot infer that intent when the will conveys no hint of [it]"). See also *Bray* v. *Bray,* 359 Mass. 439, 441 (1971); *Wright* v. *Benttinen,* 352 Mass. 495, 497-498 (1967).

The *Dansereau* case did not involve the use of extrinsic evidence either to create or resolve any ambiguity; and, contrary to the Flannerys' assertion here, it did not involve a will that was "plain on its face." Although the court did not expressly describe the document as ambiguous, it treated it as such, employing transposition to make the will "complete, natural and comparatively plain." *Id.* Moreover, the court could discern the testatrix's intent from the face of the will, and did not have to look beyond the four corners of the document, as the Flannerys would have us do. The court then effected that intent by applying a settled principle of construction, namely, transposition. *Id.* Finally, the court did nothing more than apply the presumption against intestacy as it was meant to be applied.

In *Sullivan* v. *Sullivan*, 26 Mass. App. Ct. 502, 504-505 (1988), the Appeals Court expressly concluded that the will was ambiguous, and therefore that the extrinsic evidence proffered by the plaintiffs should have been admitted. Contrary to the Flannerys' contention that the *Sullivan* will was "plain on its face," the Appeals Court expressly characterized the will as "not clear on its face." *Id.* at 505. Consequently, *Sullivan* lends no support for what the Flannerys seek to do — use extrinsic evidence to create an ambiguity in an unambiguous document. Indeed, the Appeals Court noted in passing that if, as here, "the meaning of the will had been clear on its face, the judge could not have considered extrinsic evidence to vary its effect." *Id.* at 505-506. That precise principle governs the instant case.

Finally, the Flannerys rely on the Restatement.[6] The Flannerys correctly claim that the language of the Restatement would liberalize the use of extrinsic evidence in will cases. It would still not, however, expand the admissibility of extrinsic evidence so far as to permit the evidence at issue in the present appeal. Section 11.1 states:

"An ambiguity in a donative document is an uncertainty

[6]This draft was submitted to the members of the American Law Institute for discussion at its seventy-second annual meeting in May, 1995. The discussion is reported in Proceeding of the American Law Institute, May, 1995, at 45-65 (1996). The members voted to approve the draft "subject to the customary consideration [by the Reporters] of the comments on the floor and to the usual editorial leeway." *Id.* at 65. The final version of this portion of the Restatement has not been drafted. However, we have cited this draft of the Restatement with approval in at least two recent decisions. See *BankBoston* v. *Marlow*, 428 Mass. 283, 285-286 (1998) (reformation of trust); *Putnam* v. *Putnam*, 425 Mass. 770, 772-773 (1997) (same).

in meaning that is revealed by the text or by extrinsic evidence other than direct evidence of intention contradicting the plain meaning of the text."

Restatement, *supra* at 27. Because it is arguable that most of the Flannerys' extrinsic evidence in this case would be "direct evidence of intention contradicting the plain meaning of the text," and as such, inadmissible to establish an ambiguity under § 11.1, the Flannerys turn to § 11.2(b)(3), which states:

"Ambiguities to which no rule of construction or constructional preference applies include those arising when . . . (3) extrinsic evidence (other than direct evidence contradicting the plain meaning of the text) reveals that the donor's personal usage differs from the ordinary meaning of a term used in the text."

Restatement, *supra* at 31. The Flannerys claim that § 11.2(b)(3) supports the admission of extrinsic evidence to establish the decedent's "personal usage" of the phrase "to my beloved wife" actually meant "to my beloved wife if she survives me, but if not then to her sisters who survive me." This argument seriously distorts what is meant by evidence of "personal usage" in the Restatement. The Restatement expressly provides:

"[t]he donor's personal usage is the donor's habitual use of a term in an idiosyncratic manner . . . [such as] the donor's profession, business, religion, or academic discipline . . . . Personal usage does not, however, embrace *direct extrinsic evidence of intention contradicting the plain meaning of the text*" (emphasis in original).

*Id.* at § 11.2 comment r at 56.

Additionally, all of the relevant illustrations of this principle set forth in the Restatement make it clear that "personal usage" evidence is permitted only where the testator habitually referred to someone or something in an idiosyncratic manner during his lifetime, and then used that idiosyncratic terminology in his will.[7] *Id.* at § 11.2 comments t and u, illustrations 21-24, at 59-62. The Restatement's "personal usage" doctrine obviously

---

[7]Additional proof that the plaintiffs have misinterpreted the Restatement's "personal usage" doctrine comes from remarks at the annual meeting at which this draft of the Restatement was discussed. The Reporter clearly states

does not apply in this case, because the Flannerys do not claim, and it would be essentially inconceivable, that the decedent habitually used the term "my wife" to mean "my wife or her sisters if she predeceases me."[8]

Consequently, the authorities offered by the Flannerys do not support the admission of extrinsic evidence to construe the will in these circumstances. As such, we find that the probate judge did not err in her ruling.

b. *Reformation.* Reformation of wills is presently prohibited in Massachusetts. The traditional rule with respect to reformation has been stated as follows:

> "Courts have no power to reform wills. Hypothetical or imaginary mistakes of testators cannot be corrected. Omissions can not be supplied. Language cannot be modified to meet unforeseen changes in conditions. The only means for ascertaining the intent of the testator are the words written and the acts done by him."

*Sanderson* v. *Norcross*, 242 Mass. 43, 46 (1922). See *Gove* v. *Hammond*, 385 Mass. 1001, 1001-1002 (1982) (defendants' application for further appellate review granted in order to restate the antireformation rule); *Polsey* v. *Newton*, 199 Mass. 450, 454 (1908) ("The written instrument is the final and unalterable expression of the purpose of the testator. The power of the court is limited to interpretation and construction. It cannot make a new will"). Moreover, "[t]he fact that [the will] was not in

---

that nothing less than "habitual reference in common speech" constitutes "personal usage." Proceedings of the American Law Institute, *supra* at 57, 60.

[8]Comment t to § 11.2 of the Restatement (Third) of Property (Donative Transfers) (Tent. Draft No. 1, 1995), poses an additional hurdle for the Flannerys in this case: "A complicating factor that can affect some personal-usage cases arises if the term in question is a legal term appearing in a document drafted by a legal professional. Despite the donor's personal usage, the use of a legal term by a legal professional constitutes circumstantial evidence that the term was intended to be defined in accordance with its legal meaning. . . . Because the professional-use evidence tends to offset the personal-usage evidence, the legal term would ordinarily be construed in accordance with its legal meaning. If there is other evidence on the question, however, that evidence is considered in seeking to determine the donor's intention." *Id.* at 60. Thus, in this case, if an attorney drafted the decedent's will (a fact which is not clear in the record, but which the Flannerys seem to be assuming), the use of the phrase "to my beloved wife," which carries plain legal consequences that do not include Katherine's sisters if she predeceases the decedent, would not easily be modified by personal usage evidence.

conformity to the instructions given to the draftsman who prepared it or that he made a mistake does not authorize a court to reform or alter it or remould it by amendments." *Mahoney* v. *Grainger*, 283 Mass. 189, 191 (1933).

Nevertheless, the Flannerys urge us to reject this basic tenet. Specifically, they point to *Putnam* v. *Putnam*, 425 Mass. 770, 772 n.3 (1997), where in the dictum of a footnote we noted that "[t]he case may be hard to make . . . for denying reformation of a will where in substantively similar circumstances, we would allow reformation of a trust instrument. . . . Evidence of intention may be relevant and admissible on the issue of mistake, that is, to support the reformation of the instrument." The Flannerys use this statement to argue that we should join what the Restatement terms, "the minority but growing view," under which mistaken wills can be reformed. Restatement, *supra* at § 12.1 Reporter's Note at 134.

Section 12.1 of the Restatement provides for the reformation of an unambiguous donative document in order to conform the text to the donor's intention. Such reformation is permitted where the party seeking reformation can establish (1) a mistake of fact or law in the document; and (2) the donor's intention by clear and convincing evidence. Restatement, *supra* at 113.

However, the reformation of a will, which would dispose of estate property based on unattested testamentary language, would violate the Statute of Wills. G. L. c. 191, § 1. Strong policy reasons also militate against the requested reformation. To allow for reformation in this case would open the floodgates of litigation and lead to untold confusion in the probate of wills. It would essentially invite disgruntled individuals excluded from a will to demonstrate extrinsic evidence of the decedent's "intent" to include them. The number of groundless will contests could soar. We disagree that employing "full, clear and decisive proof" as the standard for reformation of wills would suffice to remedy such problems. Cf. *Putnam* v. *Putnam*, 425 Mass. 770, 772-773 (1997), quoting *Berman* v. *Sandler*, 379 Mass. 506, 509 (1980), and citing Restatement, *supra* at § 12.1. Judicial resources are simply too scarce to squander on such consequences. Finally, we are not persuaded by the decisions of other jurisdictions.[9] Therefore, we decline to join the minority and decline to follow the Restatement.

---

[9] The Flannerys cite *Erickson* v. *Erickson*, 246 Conn. 359 (1998), in support of reformation. That case held that extrinsic evidence of a scrivener's mistake

Additionally, the Flannerys urge us to apply the holdings of *Putnam* v. *Putnam*, 366 Mass. 261 (1974), and *Shawmut Bank, N.A.* v. *Buckley*, 422 Mass. 706 (1996), that allowed for the reformation of wills to achieve the testators' intent with respect to tax objectives.[10] In *Putnam* v. *Putnam*, *supra* at 262, 266, we construed a will to resolve a conflict, as we would an ambiguity, to conform to the decedent's intentions to take advantage of the maximum marital deduction permitted under the Federal estate tax law. The Flannerys interpret this case to mean that we implicitly ordered reformation.[11] In *Shawmut Bank, N.A.* v. *Buckley*, *supra* at 714, we eliminated a clause from a will to ef-

---

in a testamentary document was admissible in a proceeding to determine the validity of that document. *Id.* at 371. Although the case did discuss several of our objections to reformation, it did not involve a will reformation. *Id.* at 361. Moreover, even assuming, arguendo, that it did apply, we would nonetheless expressly disagree with the *Erikson* court's response to our objections, and decline to adopt it in lieu of well-established Massachusetts precedent.

Additionally, the Restatement, *supra* at Reporter's Note at 135, cites *Matter of Snide*, 52 N.Y.2d 193, 199-197 (1981), which permitted reformation of a will to correct a mistake, where the decedent and his wife, both intending to execute mutual wills, each accidentally executed the will intended for the other. The court allowed for reformation solely on "these very narrow facts," *id.* at 197, noting that it was a "very unusual case." *Id.* at 196. Given the narrow holding, it does not support reformation as a general doctrine.

The Restatement notes that other jurisdictions have implicitly allowed for the reformation of wills by ordering a remedy "that is reformation, whether so described or not." Restatement, *supra* at Reporter's Note at 134. See *Wilson* v. *First Fla. Bank*, 498 So. 2d 1289 (Fla. Dist. Ct. App. 1986); *Estate of Ikuta*, 64 Haw. 236 (1981); *McCauley* v. *Alexander*, 543 S.W.2d 699 (Tex. Civ. App. 1976); *Estate of Lohr*, 174 Wis. 2d 468 (Ct. App. 1993). However, each of these cases involves an ambiguous will, making them inapplicable to the case at bar.

[10]The Flannerys note that this court has allowed for the reformation of inter vivos trusts where the results of the trust were clearly inconsistent with the settlors' tax objectives. See *DiCarlo* v. *Mazzarella*, 430 Mass. 248 (1999); *Fleet Bank, N.A.* v. *Fleet Bank, N.A.*, 429 Mass. 1003 (1999); *BankBoston* v. *Marlow*, 428 Mass. 283 (1998); *Pond* v. *Pond*, 424 Mass. 894 (1997); *Simches* v. *Simches*, 423 Mass. 683 (1996); *Loeser* v. *Talbot*, 412 Mass. 361 (1992); *Berman* v. *Sandler*, 379 Mass. 506 (1980). However, inter vivos trusts are not testamentary documents, and therefore need not meet the formalities required for the execution of a will under G. L. c. 191, § 1.

[11]The Flannerys contend that when we ordered the trial court, in *Putnam* v. *Putnam*, 366 Mass. 261, 272 (1974), to enter a decree declaring that all inheritance taxes ever imposed on future interests in the marital trust be paid from the companion nonmarital trust, we implicitly reformed the will.

fectuate the testator's intention to minimize the Federal estate taxation of her testamentary trust.

Both cases are distinguishable from the present claim for reformation. First, the decisions permitted reformation in very limited circumstances: namely, achieving favorable Federal estate tax treatment with respect to testamentary trusts. In Massachusetts, "[w]e have allowed the reformation of trust instruments which produced tax results that were clearly inconsistent with the settlor's tax objectives." *BankBoston* v. *Marlow*, 428 Mass. 283, 285 (1998). See *Putnam* v. *Putnam*, 425 Mass. 770, 772-773 (1997); *Pond* v. *Pond*, 424 Mass. 894, 899 (1997); *Simches* v. *Simches*, 423 Mass. 683, 687-688 (1996). However, given the absence of any tax issues here, it certainly does not fall within the ambit of that very narrow exception.[12]

Second, neither the *Putnam* nor the *Buckley* case admitted extrinsic evidence to ascertain the testators' intent, as the Flannerys urge us to do. See *Shawmut Bank, N.A.* v. *Buckley, supra* at 712; *Putnam* v. *Putnam*, 366 Mass. 261, 267-268 (1974). On the contrary, the *Putnam* court looked only at the document's face to find that its language, "standing alone shows that [the testator] intended to have his estate utilize the maximum permissible marital deduction in computing the Federal estate tax payable on his death."[13] *Putnam* v. *Putnam, supra* at 267. Likewise, the *Buckley* court looked only at the will to determine that it was "obviously written with tax considerations in mind and was a standard instrument in many ways for accomplishing estate tax minimization." *Shawmut Bank, N.A.* v. *Buckley, supra* at 711.

Third, in both cases, none of the parties to the proceedings objected to the construction or reformation of the wills. *Shawmut Bank, N.A.* v. *Buckley, supra* at 711 (parties agreed that

---

[12]Moreover, both cases noted that, unless otherwise stated, "[i]nherent in the provisions of [a] will is the intent that no general provision should be applied to produce a Federal estate . . . tax result that would solely benefit" the taxing authorities. *Shawmut Bank, N.A.* v. *Buckley*, 422 Mass. 706, 711 (1996). See *Putnam* v. *Putnam, supra* at 271. It cannot be said that an intent to benefit the decedent's sisters-in-law if his wife predeceased him is similarly inherent in the provisions of his will.

[13]*Putnam* v. *Putnam*, 366 Mass. 261, 267-269 (1974), did advert to extrinsic evidence, but only to resolve the ambiguous language in the will, not to ascertain the testator's intent.

testator's will was written with tax considerations in mind).[14] *Putnam* v. *Putnam, supra* at 265-266 & n.8 (parties did not disagree that burden of inheritance taxes as to future interests in marital trust should be borne by assets held in companion non-marital trust). To be sure, in this case, there is no such consensus among the parties.

Accordingly, neither case supports the admission of extrinsic evidence of the decedent's alleged intent in order to reform the will.

3. *Conclusion.*

For the reasons stated, the decedent's will can neither be construed nor reformed to read, "all . . . to my beloved wife, Katherine M. White, if she survives me, but if not, then to her sisters who survive me," in lieu of what the will plainly states on its face: "all . . . to my beloved wife, Katherine M. White." The order of the Probate Court granting the defendants' motions for summary judgment is affirmed, and a declaratory judgment shall issue.

*So ordered.*

GREANEY, J. (concurring in the result, with whom Abrams, J., joins). I agree with the conclusion that summary judgment was properly entered for the defendants. I write separately because I disagree with the court's reasoning on the reformation issue.

There is, as the court has discussed, no ambiguity in the will. As to reformation, the court concludes that our rule prohibiting the reformation of a will applies and precludes consideration of the remedy. In reaching this conclusion, the court effectively shuts the door on consideration, in an appropriate case, of reformation of a will to correct a mistake which negates the testator's intent.

In writing for the court in *Putnam* v. *Putnam*, 425 Mass. 770,

---

[14]The guardian ad litem representing the minor and unborn issue of one of the testatrix's daughters argued that the offending words should be struck entirely from the testamentary document, while the testatrix's husband and the guardian ad litem representing the minor and unborn issue of the other daughter argued that the offending phrase should be construed in a manner favorable to them. *Shawmut Bank, N.A.* v. *Buckley, supra* at 709. However, none of the parties objected to the actual construction or reformation of the will. *Id.* at 711.

772 n.3 (1997), Chief Justice Wilkins stated: "For reasons that may no longer be meaningful, we have been less willing to recognize the possibility of proof of mistake in the drafting of a will (as opposed to an inter vivos trust) that is unambiguous on its face. The case may be hard to make, however, for denying reformation of a will where, in substantively similar circumstances, we would allow reformation of a trust instrument. See Restatement of Property (Donative Transfers) § 12.1 comment c (Tent. Draft No. 1 1995)." Section 12.1 of the Restatement states principles that would permit an unambiguous will to be reformed to conform the text of the will to the testator's intent when clear and convincing evidence establishes "(1) that a mistake of fact or law, whether in expression or inducement, affected specific terms of the document; and (2) what the donor's intention was." As the Restatement points out, and cases demonstrate, there are instances where mistakes in a will, of the nature described above, caused by scrivener's error, incorrect legal advice, misrepresentations, and the like, may call for reformation of an unambiguous text. See Restatement, *supra* at comment i, at illustrations 4 and 6, at 121-122. See also *Erickson* v. *Erickson*, 246 Conn. 359 (1998); and cases collected in the Reporter's Note to comment e of the Restatement, *supra* at 134-137.

In addition to the discussion in the Restatement, *supra*, the analysis in *Erickson* v. *Erickson*, *supra* at 373-375, persuasively dispels the usual arguments for not permitting extrinsic evidence, in an appropriate case, to reform an unambiguous will so the will's provisions accurately express the testator's intent. The most common argument against reformation is the one adopted by the court that allowance of the remedy would open the floodgates to "invite disgruntled individuals excluded from a will to demonstrate extrinsic evidence of the decedent's 'intent' to include them." *Ante* at 674. There is a short and complete answer that discloses the speciousness of this statement. That answer, given by the Restatement, *supra*, is that reformation is not available, as matter of law, to an individual claiming that he is the true object of the testator's bounty, because the will states the testator's intent accurately, and the testator's mistake, if one occurred at all, was his own subsequent failure to execute a codicil or new will to carry out his new intent. See Restatement, *supra* at comment h illustration 2, at 120.

I suspect that, in an appropriate case, the court will conclude

that an unambiguous will should be reformed because of a proven mistake in expression or inducement. When that case arrives, the court will either have to reject or revise what is said about reformation in this opinion or struggle to create an ambiguity, where none exists, in order to permit reformation. On the reformation issue, I would frame the analysis in these terms:

(a) in an appropriate case, consistent with what was said by the unanimous court in *Putnam* v. *Putnam, supra,* we are open to consider reformation of an unambiguous will to correct a mistake;

(b) the plaintiffs are not entitled to reformation here, because, even accepting the principles expressed in the Restatement, *supra,* a case for reformation is not present. There is no mistake in expression or inducement. The will states the decedent's intent accurately, and the mistake was his own for failing to execute a codicil or a new will.[1]

---

[1]Even though this general principle governs the case, it is worth noting that the plaintiffs' complaint states their belief that the defendant Paul J. McNamara, the administrator of the estate with the will annexed and a lawyer, "recommended to [the decedent] on numerous occasions that [the decedent] arrange for . . . McNamara to review [the decedent's] will," but the decedent never did so because "he . . . understood that his [w]ill provided for property to go to [p]laintiffs if [his wife] were to predecease him." The decedent's mistake, if he made one at all, was grounded in his own failure to obtain review of his will by a lawyer.