NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-221                                    Appeals Court

IN THE MATTER OF THE ESTATE OF FRED S. ROSEN
(and a companion case[1]).


No. 13-P-221.

Suffolk.      December 10, 2013. - December 30, 2014.

Present:  Berry, Meade, & Agnes, JJ.


Will, Testamentary capacity, Power of appointment, Construction.
    Devise and Legacy, Power of appointment.  Probate Court,
    Attorney's fees.  Practice, Civil, Attorney's fees, Summary
    judgment.  Power of Appointment.



    Petition for probate of a will filed in the Suffolk
Division of the Probate and Family Court Department on June 8,
2005.

    Complaint in equity filed in the Suffolk Division of the
Probate and Family Court Department on October 14, 2005.

    After consolidation, the cases were heard by Elaine J.
Moriarty, J., on motions for summary judgment; the cases were
heard by her; and a motion for attorney's fees was considered by
her.


    Susan E. Stenger for William P. Girard.
    Michael H. Riley for Rachelle A. Rosenbaum & others.


_____

    [1] William P. Girard vs. Mayya Geha, Mirna Geha Andrews, and
Tanya Geha.

BERRY, J.  William P. Girard,[2] will contestant and plaintiff in an equity action consolidated in the Probate and Family Court, appeals from (1) a decree allowing the will of Fred S. Rosen (decedent or testator), (2) a judgment dismissing Girard's complaint in equity against Mayya Geha, Mirna Geha Andrews, and Tanya Geha (Geha sisters), which challenged the decedent's beneficiary designation for his Teachers Insurance and Annuity Association of America - College Retirement Equities Fund (TIAA-CREF) account, (3) a judgment on a counterclaim brought in the equity action by the Geha sisters that held the TIAA-CREF beneficiary designation valid.  Girard first argues that the testator lacked testamentary capacity when, on May 12, 2005, the testator executed his will and changed the beneficiary designation on his TIAA-CREF account.  He also argues that regardless of the allowance of the will, article II (tangibles remainder provision) is invalid for lack of sufficiently identifiable beneficiaries.  He further contends that the award of attorney's fees should be vacated because it is excessive and was entered before he was allowed an opportunity to respond to the petition.  We affirm.

---

[2] We refer to William P. Girard by his last name.  We refer to his brother, who is mentioned below, by his full name, John Girard.

Background.  The testator, who had been a physician, never married, he had no children or siblings, and his parents were both deceased.  However, during his seventy-four years he formed many close friendships with various colleagues and their families,[3] as well as Girard and his brother (John Girard), long-time patients he had treated since childhood.

In May, 2005, the testator's health was deteriorating due to a terminal illness; on March 11, 2005, after surgery to remove a metastasized tumor, he was transferred from Brigham and Women's Hospital to Youville Rehabilitation Center (Youville), then subsequently, on May 4, 2005, to the Sherrill House, where he remained until his death on May 21, 2005.

The testator and Girard shared an especially close relationship.  He was very active in guiding Girard's education, assisted in finding him employment, sometimes supplemented his income, and often traveled with him, especially to Anguilla; Girard resided with the testator at certain times, drove the testator to doctor visits, regularly visited with him during the early stages of his illness in 2004 and 2005, brought the testator his mail while he was convalescing at a friend's home,

---

[3] Dr. Raif Geha and his wife Orietta Geha (coexecutrix) had been friends with the testator since 1972; Orietta is also the mother of the Geha sisters; the testator was the godfather to all three of the Geha sisters.  Rachelle Rosenbaum (coexecutrix) was the testator's long-time assistant at the Center for Blood Research.  Dr. David Nathan was a long-time friend and colleague.

and was very involved in the planning, design, and building of the testator's Anguilla home.  However, between March 26, 2005, and May 18, 2005, the final months of the testator's illness, Girard neither telephoned nor visited the testator after a disagreement between the two men in March, 2005, regarding Girard's dire financial situation.[4]  In April, 2005, the testator separately conveyed to Orietta Geha, and later Attorney Robert M. Allen and Rachelle Rosenbaum, that he felt that Girard was not capable of handling the caretaking of the testator's Anguilla property and wanted to place the property in a trust.

On April 12, 2005, Attorney Allen met the testator at Youville (Rosenbaum was present taking notes) to discuss placing the Anguilla property into a land trust, removing Girard as a beneficiary of the tangible items listed in his will, and nominating Rosenbaum as a coexecutrix.  The testator met again with Attorney Allen at the Sherrill House at 11:30 A.M. on May 9, 2005, to discuss and execute the newly drafted codicil to the

---

[4] In January, 2005, the testator gave Girard a check for $1,500, and another $1,000 at the end of February, 2005; in March, 2005, while a patient at Youville, the testator refused to give Girard $350 for his health insurance payment, telling him instead "it would do him good to earn a living."  Girard then "reminded" the testator of their January, 2005, conversation that Girard would quit his teaching job and care for the testator during his illness; the testator "yelled at [ ] Girard to leave and not come back."

testator's October 21, 2004, will, and a new health care proxy.[5] The testator's signature on each instrument was witnessed by two staff members of the Sherrill House -- Stephanie Recchia,[6] the testator's appointed clinical social worker, and nurse manager James Sugrue.

On May 12, 2005, Attorney Allen returned to the Sherrill House, accompanied by two of his employees (Jean Stremeckus and Susan Polk) to witness the testator's execution of certain documents. The testator first acknowledged and executed the

---

[5] On April 28, 2005, a psychiatric evaluation, which was performed at Youville on the testator by nurse Marsha Gilmore, indicated that the testator's "orientation, attention, concentration, memory, language naming, fundamental judgment and insight were normal." On May 2, 2005, a follow-up mental status evaluation indicated a "normal" reading. The testator was discharged from Youville on May 4, 2005, and transferred to the Sherrill House; the discharge report indicated that he was "alert and oriented times four" and "able to participate in goal setting." Upon his admission to the Sherrill House that same day, a "mini-mental health examination" reflected that the testator scored a perfect "30 out of 30."

[6] Recchia testified at trial that prior to witnessing the execution of the codicil and health care proxy, the testator did not appear to be confused and made eye contact with each person speaking to him. Later that same day (at 4:15 P.M.), Recchia performed a mini-mental state examination on the testator because when she went to speak with him about a complaint he had made about a staff member, "he did not appear the same way [she] had found him in the morning cognitively and his complaint was not making sense"; he scored a 19 out of 30, indicating impairment. She noted in his chart that she suspected "delirium," "most likely secondary to transfer."

Fred S. Rosen Land Trust (land trust)[7] relating to the Anguilla property; he next executed his revised will[8] and, then, executed the TIAA-CREF beneficiary designation form, changing the beneficiary from Girard to the Geha sisters.[9] However, the testator declined, upon Attorney Allen's inquiry, to remove the Girard brothers as residuary beneficiaries under the will. Attorney Allen testified at trial that the testator seemed to have given thought to his decision to change the beneficiary on his TIAA-CREF account, and that although he was gaunt and

---

[7] This court affirmed a Probate and Family Court judge's determination that the land trust was invalid for want of definite beneficiaries, and "any trust assets would pass to the estate of Rosen, in lieu of the provisions of the trust." See Girard v. Allen, 68 Mass. App. Ct. 1110 (2007) (memorandum and order pursuant to rule 1:28).

[8] The testator's October 19, 2001, will named John Girard and Orietta Geha as executors, left a Boston condominium and the house in Anguilla to the Girard brothers, the residuary beneficiaries were the Geha sisters; the superceding September 19, 2002, will instructed that the Boston condominium be sold, and named the Girard brothers as residuary beneficiaries (with the Geha sisters as contingent residuary beneficiaries); the superceding October 21, 2004, will removed John Girard as coexecutor, leaving Orietta Geha as sole executrix and Mirna Geha as successor, and the Anguilla property was left solely to William Girard; the contested May 12, 2005, will removed the Anguilla property and $100,000 from the estate, placing them in the land trust.

[9] When Attorney Allen reviewed the disposition of assets held in the TIAA-CREF account, indicating that Girard was the named beneficiary, the testator "shook his head no," wanting to make the beneficiary change because the testator was "very disappointed in Bill Girard, that over the last few months [he] hadn't seen Bill Girard, and that [Bill] had separated himself from [the testator]'s life and seemed to be scared away by [his] illness."

appeared to be in periodic pain, he appeared to follow the discussion in a manner consistent with prior meetings, making regular eye contact and appropriate responses to questions. Both Stremeckus and Polk agreed with Attorney Allen's assessment.

The testator's May 12, 2005, will, executed nine days before his death, was presented for probate on June 8, 2005, by Orietta Geha and Rosenbaum, coexecutrices nominated under the will. On August 2, 2005, Girard filed an objection to the probate of the will, and, subsequently, an amended complaint in equity challenging the decedent's beneficiary designation on his TIAA-CREF account. He asserted that the testator lacked testamentary capacity at the time of execution of these documents.[10] On December 7, 2005, Girard successfully secured a preliminary injunction in the equity action halting the distribution of funds from the testator's TIAA-CREF account to the designated beneficiaries. The probate matter and equity action were later consolidated.

After several days of trial during June, August, and September, 2010, the judge made more than four hundred findings on the sole issue of the testator's testamentary capacity on May 12, 2005, when he executed his revised will and changed the

_____

[10] As to the will, Girard also asserted a claim of undue influence. The judge allowed the executrices' motion for summary judgment on this claim.

TIAA-CREF beneficiary designation. The judge found that the testator's medical records show some "instances of confusion" in the days leading up to, and following, the execution of his will and change in beneficiary designation; however, she also found that when the testator executed his will and changed the TIAA-CREF beneficiary, he "did not have confusion caused by delirium," but, in fact, had "testamentary capacity to execute a will" and his estate plan "was not an unnatural disposition of his assets."

The judge concluded that "at the time he executed the will and the change in beneficiary to his TIAA CREF retirement plan Dr. Rosen had testamentary capacity to do so; understood the nature of his assets . . . and understood the objects of his bounty"; she reasoned that the testator "was not suffering from del[i]rium at this time to the extent that it produced any confusion which would preclude his ability to understand how he wanted to leave his estate and that he was executing estate documents."[11] She also determined that the testator "had a long history of interest and devotion to [the Geha sisters] and provided them past financial gifts, provided advice on their

---

[11] The judge also found that the testator's "actions in remembering the need to obtain the social security numbers, actually following through and obtaining them from Dr. Geha, and then following through further and relaying them to Attorney Allen speaks to his mental capacity over the course of the day, and his determination that this is what he wanted to do."

educational choices, and attended school graduations" and "also enjoyed a very close relationship with the Girard brothers until the last months of his life."  The judge gave weight to the testimony of Attorney Allen, and the two witnesses to the will and TIAA-CREF beneficiary change.

Discussion.  Testamentary capacity.  It is well established that to determine testamentary capacity "[t]he critical question is whether the testator was of sound mind at the time the will was executed.  It has been held that, 'a person [ . . . ] may possess testamentary capacity at any given time and lack it at all other times.'"  O'Rourke v. Hunter, 446 Mass. 814, 827 (2006), quoting from Daly v. Hussey, 275 Mass. 28, 29 (1931).  The proponent has the burden of proving testamentary capacity.  O'Rourke v. Hunter, supra.  "A presumption that the testator had the requisite testamentary capacity aids the proponent, but it disappears if the opponent presents evidence of lack of capacity."  Maimonides Sch. v. Coles, 71 Mass. App. Ct. 240, 252 (2008).  The requisite capacity "requires freedom from delusion which is the effect of disease or weakness and which might influence the disposition of his property.  And it requires ability at the time of execution of the alleged will to comprehend the nature of the act of making a will."  Paine v. Sullivan, 79 Mass. App. Ct. 811, 817 (2011), quoting from Palmer v. Palmer, 23 Mass. App. Ct. 245, 250 (1986).

With respect to the testator's testamentary capacity, there was evidence that the judge credited that on the morning the testator executed his will and TIAA-CREF beneficiary change he was bright and conversant; he asked for assistance with an outside telephone line from his room then dialed the intended number from memory; he asked Dr. Geha for the social security numbers of his daughters so that he could leave them retirement money, then later called Attorney Allen to recite the social security numbers to him to include on the beneficiary designation form; at the time of execution, Attorney Allen, and both witnesses, observed the testator to be alert, making eye contact during discussions and seeming to understand everything that was being said to him regarding changes that were being made to his estate per his requests.

Girard counters by emphasizing notations in the testator's medical records indicating sporadic periods of confusion and hallucinations from which he suffered (some caused by medication), and expert testimony by a nontreating physician specializing in geriatric psychiatry. However, these arguments reveal only that there were conflicts in the evidence. Girard has "provided no basis to doubt that the judge, who was in 'a superior position to appraise and weigh the evidence,' carefully considered the conflicting evidence and assigned it the weight [she] thought appropriate." Brandao v. DoCanto, 80 Mass. App.

Ct. 151, 155-156 (2011) (citation omitted). "With evidence in the record sufficient to support [the judge's] finding that the decedent was competent to execute the will and [beneficiary designation], the existence of contrary evidence did not render [her] finding unwarranted." Rempelakis v. Russell, 65 Mass. App. Ct. 557, 568 (2006).

In sum, the contestant's evidence is insufficient to defeat the presumption that the testator had the requisite testamentary capacity to execute his May 12, 2005, will and TIAA-CREF beneficiary designation form. See Maimonides Sch. v. Coles, supra at 254.

Tangible remainder provision. Girard also argues that the judge erred in granting partial summary judgment in favor of the coexecutrices after determining that the tangible remainder provision contained in article II of the May 12, 2005, will was a valid power of appointment. He claims that the provision creates a trust, which fails, because the language designating "one or more of my friends" does not provide for sufficiently ascertainable beneficiaries.

To begin, because the language of article II does not provide the entire class of beneficiaries, we agree with the trial judge that it is invalid as a trust. See Minot v. Attorney Gen., 189 Mass. 176, 180-181 (1905). See also Restatement (Third) of Trusts § 46 comment a (2003).

We look next to determine whether the provision creates a power of appointment.  "A power of appointment is a power of disposition given to a person over property not his own by [someone] who directs the mode in which that power shall be exercised by a particular instrument."  Thompson v. Pew, 214 Mass. 520, 522 (1913) (citation omitted).  The power can be either general or specific, or "[a] power may be to appoint by deed or will."  Ibid.  However, if the power is not expressly referenced in the contested will provision, "[t]he execution of [such] power is a question of intent."  Frye v. Loring, 330 Mass. 389, 394 (1953).  "[I]n construing language in a will, '[t]he fundamental object . . . is to ascertain the testator's intention from the whole instrument, attributing due weight to all its language, considered in light of the circumstances known to the testator at the time of its execution, and to give effect to that intent unless some positive rule of law forbids.'"  Hochberg v. Proctor, 441 Mass. 403, 410 (2004), quoting from Flannery v. McNamara, 432 Mass. 665, 667-668 (2000).

Here, it is clear from the language of article II that the testator intended for the executrices to make decisions as to the particular friends to whom, or charitable organizations to which, his tangible personal property would be distributed.[12]

_____

[12] Article II provides:  "I give the balance of my tangible personal property, including any items not effectively disposed

The provision grants an "absolute and uncontrolled" power to the executrices to determine the intended recipients of the property, but also imposes limitations as to the recipients and the maximum amount to be received by the executrices. We agree with the trial judge that construing this language as a power of appointment "would preserve [the testator's] intent and allow the [executrices] to administer the estate in a way that is consistent with [the testator's] overall estate plan, including the other articles in the contested May 12, 2005, Will." Interpreting the language of article II in this manner effectively harmonizes the provisions of the entire instrument. See Hershman-Tcherepnin v. Tcherepnin, 452 Mass. 77, 84 (2008).

As there are no genuine issues of material fact, the judge properly granted partial summary judgment in favor of the proponents. See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002); Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-644 (2002).

Attorney's fees for probate matter. Girard finally argues that the award of attorney's fees and costs to counsel for the coexecutrices should be vacated, because it is excessive. As reduced, in part, by the Probate Court judge, the fees awarded

_____

of in accordance with the preceding provisions of this Article, to and among such one or more of my friends (including my Executor) or such one or more charitable organizations described in Sections 170(c) and 2055 of the Code as my Executor shall, in my Executor's absolute and uncontrolled discretion, select."

to the counsel for the coexecutrices of the will were $140,015. We conclude that the amount of the attorney's fees in this complex case involving a four million dollar estate, a seven-day trial in the Probate Court and a separate equity action were well justified in the Probate Court judge's rationale.[13]

The Probate Court has broad discretion to determine an appropriate award of fees, costs, and expenses to an attorney

---

[13] The Probate Court judge entered fulsome findings and a rationale for the attorney's fee award, including, in pertinent part, as follows:

"Both the probate and equity cases involved substantial time. Both the probate and equity cases were consolidated for a seven day trial and included trial preparation and post trial preparation of proposed findings of fact. The case involved reviewing estate planning documents, extensive medical records, interviewing eleven people referenced in the statement of objections to the will along with the witnesses to the will; preparation of six witnesses for deposition, attending eleven depositions (three of which were two days); drafting pleadings, drafting and responding to discovery, reviewing pension documents, preparation of motion for summary judgment on undue influence issue including multiple affidavits and preparation of oppositions to motion for summary judgment of objectant. Court appearances on motion for summary judgment, pretrial conference, status conference, preparation of twelve witnesses for trial; preparation of trial exhibits; retention and preparation of expert witnesses, miscellaneous correspondence and telephone calls. Counsel prevailed on the motion for summary judgment as to the undue influence issue.

"The equity action similarly entailed miscellaneous correspondence and telephone communications with different parties and preparation and response to discovery, preparation of a motion for summary judgment; preparation of three defendants for depositions, and attendance at depositions."

for services rendered to an estate.  See G. L. c. 215, §§ 39A,
45.  See also Matter of the Estate of King, 455 Mass. 796, 809
(2010).  The factors to be considered in such award are numerous
but well established.  Id. at 807.  "Moreover, where fees are
paid to counsel who may not have been employed by those whose
estates are thus diminished they are to be awarded on strictly
conservative principles."  Id. at 808 (quotations and citation
omitted).

    As evidenced by the findings with regard to the attorney's
fees, the trial judge considered the factors required in
determining a fair and reasonable award of fees and costs.  In
addition, it is apparent from her reduction of certain fees and
costs that she carefully reviewed the attorney's billing
records, and proportionately allocated the award between the
probate and equity matters.  For this reason, we see no error
and certainly no abuse of her broad discretion in the award
imposed.[14]

---

    [14] In one ending paragraph in his brief, Girard challenges
the award of attorney's fees, contending that some
undifferentiated part of the award should be set aside because
it relates to the equity action, rather than to the estate
litigation.  In this paragraph, Girard also argues that the
judge indicated that, if she ultimately ruled in the
coexecutrices favor, Girard could file an opposition to the
attorney's fees request filed by the coexecutrices.  Girard,
however, never filed a motion pertaining to the fee request in
the Probate Court, nor did he seek leave in this court to do so,
and this was so notwithstanding the delayed notice of the final
judgment in favor of the coexecutrices.  The one ending

Attorney's fees for appeal.  The coexecutrices have filed a motion for appellate attorney's fees with a submission detailing the legal work done and the hours billed supporting the attorney's fees requested.  Rather than filing a separate motion, the correct procedure is to request attorney's fees in the appellate brief.  See Fabre v. Walton, 441 Mass. 9, 10 (2004) ("[W]here a party seeks an award of appellate fees, he or she must make that request in the brief").

We note that in this case, the motion fully addresses the issue of appellate fees.  The coexecutrices have prevailed on appeal, and the attorney's fees will be charged against the estate.  Hence, in this particular case, we deem it appropriate not to elevate form over substance, and we will, in our discretion, consider the motion as filed.  "[A]n appellate court retains the authority to consider a waived request [for attorney's fees] as a matter of discretion."  Beal Bank, SSB v. Eurich, 448 Mass. 9, 12 (2006).

Girard's counsel, if appellant Girard is so inclined, is granted leave to file a response to the coexecutrices' motion

paragraph in Girard's brief, without citation to legal authority or specification, fails to meet the level of appellate argument required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).  Given the lack of adequate briefing and the lack of any opposition filing in the Probate Court, we will not further address Girard's belated contentions.  And, for the reasons stated above, we have concluded that the fee award, which was amply explained by the Probate Court judge, was not an abuse of discretion.  See note 13 and accompanying text, supra.

and submission for appellate fees.  Any such response shall be filed with the clerk of this court within fourteen days of the date of the rescript.  See Fabre v. Walton, supra ("[T]he opposing party will be afforded a reasonable opportunity to respond to [the] submission [for appellate attorney's fees]").

> In no. SU05P1241EP1, the decree allowance of will dated July 21, 2011, is affirmed.
>
> In no. SU05E0130GCI, the judgment of dismissal dated July 21, 2011, is affirmed.
>
> In no. SU05E0130GCI, the judgment on counterclaim dated July 21, 2011, is affirmed.