Berry, J.
(dissenting). I dissent because I do not think that the trial evidence was sufficient to prove that Charles P. Galatis lacked the requisite testamentary capacity at the time he executed his will on February 9, 2000. Contrary to the majority, I look to material evidentiary points at trial, which I think establish testamentary capacity.
The first trial evidentiary point of reference to which I look as proof of testimony capacity: during the afternoon of February 9, 2000, the day that Galatis signed the will, he manifested measurable periods of stability, lucidity, and awareness reflecting testamentary capacity to execute the will. Specifically, during the afternoon of February 9, the trial evidence — including contemporaneous medical records — demonstrated that Galatis was lucid and aware of his surroundings. This lucidity is clear evidence (especially when coupled with the testimony of the witnesses to the will, see discussion infra), that Galatis knew what he was doing in bequesting his estate. He knew the objects of his bounty, primarily a Greek educational charitable trust on the island of Skiathos (which would be the main beneficiary of his real estate in Greece), but also eleven other individual beneficiaries who received monetary bequests. Specifically, as more fully detailed in part 1, infra, according to the medical records, by 1 p.m. and 2 p.m. on February 9, Galatis had recovered from an adverse reaction to a drug (Ativan) that had been given to him the day before. In his recovery from the adverse drug reaction, by February 9 in the afternoon and into early evening, Galatis was back at “baseline” and had regained lucidity. For example on February 9, at 1:00 p.m., Galatis is described in the medical records as “A+O x 3” — i.e., oriented to person, place, and time. Similarly, at 2:00 *283 p.m. the medical records describe Galatis as “recovered from last night’s events” and “back to baseline.” At 7:00 p.m. Galatis is described as “clearly better than yesterday,” when the Ativan was administered. These measurable periods of clarity during the afternoon of February 9, when added to the testimony of the witnesses to the will, reflect a sufficient intervening period of testamentary capacity. “Acting during a lucid interval can be a basis for executing a will.” Farnum v. Silvano, 27 Mass. App. Ct. 536, 538 (1989). See O’Rourke v. Hunter, 446 Mass. 814, 827 (2006) (“[T]he contestants offer no evidence that she lacked testamentary capacity during the ... discussions with her attorney or . . . when she executed her will”).
The second trial evidentiary point of reference to which I look as proof of testamentary capacity: the testimony of the witnesses to the will, including the attorney who drafted the will and two nurses who served as attesting witnesses, all confirmed that Galatis was alert, responsive, and of sound mind, and knew he was executing a will. In addition, other friends visiting Galatis on February 9 testified that Galatis was alert and aware when they saw him.
The third trial evidentiary point of reference to which I look as proof of testamentary capacity: there is an almost complete congruence between the contested February 9 will and a first will signed by Galatis on February 1. That February 1 will was drafted by a nonlawyer friend at Galatis’s request, and it is undisputed that Galatis was of sound mind with testamentary capacity on February 1. It was Galatis who requested that an attorney draft the February 9 will to replace the nonlawyer’s draft. As noted, the February 9 will is wholly consistent with Galatis’s prior February 1 will bequests, including the creation of the Greek educational charitable trust, and is consistent dollar by dollar in the eleven other individual bequests totaling approximately $90,000.
Given the foregoing, I am not persuaded the contestants met the burden of proving that Galatis lacked testimony capacity. To the contrary, I read the trial evidence as supporting, by a preponderance of the evidence, that Galatis had the requisite testamentary capacity to execute his will on February 9. “It is well established that to determine testamentary capacity, [t]he critical question is whether the testator was of sound mind at the time the will was executed.” Estate of Rosen, 86 Mass. App. Ct. 793, 798 (2014), quoting from O ’Rourke v. Hunter, supra. “At the time of executing a will, the testat[or] must be free from delusion and under *284 stand the purpose of the will, the nature of [his] property, and the persons who could claim it.” O’Rourke v. Hunter, supra at 826-827. Cf. Daly v. Hussey, 275 Mass. 28, 29 (1931).
There is no dispute that the will was signed during the day on February 9 and, as referenced above, that Galatis was of sound mind, alert, and responsive during a major afternoon segment on that day. Indeed, the majority acknowledges that “[assessing Galatis’s mental state when the will was signed on February 9 against the backdrop of the medical records was made particularly challenging by the fact that no testimony or other evidence established at what time that day the signing actually took place.” Ante at 277. But even though the precise time of signature is not provable, to accept the majority’s position would be to accept the proposition that Galatis was not of sound mind to execute his will at any time on February 9. That is not so.
I turn to more details concerning the three points of the trial evidence that, I believe, show testamentary capacity.
1. The medical evidence. I begin with the contemporaneous medical records. At approximately 4:30 p.m. on February 8, 2000, the day before the will was signed, Galatis was given the drug Ativan. He had adverse reactions including a facial droop, confusion, drowsiness, asterixis, and a temporary diagnosis of encephalopathy. But quickly after the adverse reaction, Galatis was given flumazenil, an antidote to Ativan. Dr. Barrette testified that “Mr. Galatis received his first dose of Flumazenil at 6:00 pm., 90 minutes after the Ativan was given, and a second dose one hour later at 7:00 p.m.” Another physician, Dr. Whaley, confirmed that “because Flumazenil is an antidote ... it can reverse the effects of Ativan.” A third physician, Dr. Stoeckle, corroborated that flumazenil is an antidote to Ativan.
Medical notes reveal that during the early hours of the next morning on February 9, Galatis was still not at baseline. At approximately 6:00 a.m., a nurse’s note states that Galatis was “lethargic most of the night . . . Ativan reaction. Arousable to voice. . . . [s]till weak but more responsive to pain. Alert but confused to place.” At 11:00 a.m. Galatis still had lingering effects from the Ativan as “[h]is mental status is not [at] baseline.”
According to the medical records, however, as time passed to the afternoon, there was a significant turning point in Galatis’s condition as he recovered from the adverse effects of Ativan, the *285 antidote flumazenil took effect, and Galatis returned to “baseline.” This is important, because from all that appears, including the testimony by the attorney and the nurses who witnessed the will, there was stabilization noted at 1:00 p.m. and continuing throughout the afternoon of February 9, all of which supports testamentary capacity.
The stabilization is noted in a 1:00 p.m. nurse’s note stating that “pt stated he ‘felt better.’ Pt. A+O x 3 [a term meaning a patient who is oriented to person, place and time], but stated he had ‘general confusion.’ ” This note is corroborated by Dr. Stoeckle’s note of 1:30 p.m. that Galatis was “[a]lert at moment. To radiation Rx at 2:30. Again reiterated goals with patient. Ready for transfer AM.”
At about 2:00 p.m. on February 9, the medical records describe further stabilization and recovery: “pain services helped pt learn to use PCA. Pt recovered from last night’s events . . . . Pt seems back to baseline.” Dr. Stoeckle’s notes from the same time period describe Galatis as “quite alert,” and “mood up, without complaint of pain!” Lastly, as night approached, at 7:00 p.m., a nurse’s note states that Galatis was “clearly better than yesterday.” He “continues to be sleepy and at times confused and he is aware of confusion.” The note also describes that “[f]amily members going over pt legal paper and will today.”[1]
The majority (as did the trial judge) relies heavily on the expert testimony of Dr. Whaley. However, Dr. Whaley was not a treating physician but rather a psychiatrist who never examined, treated, or even met Galatis. See Union Trust Co. of Springfield v. Kittredge, 298 Mass. 515, 516 (1937) (opinions of psychiatrists that decedent was of unsound mind were insufficient to raise issue of capacity in light of detailed evidence from “physician and nurses who actually treated and cared for the decedent”); Nichols v. Sullivan, 340 Mass. 783, 783-784 (1959) (“The expected testimony of psychiatrists who had not seen the decedent. . . was of substantially less weight than [the proponents’ evidence] which would support a finding of testamentary capacity”). The majority also cites to Dr. Stoeckle’s trial testimony that Galatis *286 was mentally impaired throughout February 9 and could not understand the nature and significance of executing a will. See ante at 276. But Dr. Stoeckle’s trial testimony directly conflicts with his contemporaneous 1:30 p.m. medical record entry of Galatis’s recovery on February 9 in which Dr. Stoeckle wrote that Galatis was “quite alert,” and “mood up, without complaint of pain!”[2] Further, Dr. Stoeckle conceded on cross-examination that he did not know what it meant to have, or not have, testamentary capacity. And, I note there was a hotly contested trial debate whether Dr. Stoeckle’s affidavit, which was prepared in connection with the will contest and which includes a negative opinion about testamentary capacity, had been drafted by the trial attorney for the contestants notwithstanding the conflicting entry by Dr. Stoeckle in the contemporaneous February 9 medical records.
2. Witnesses to the will and other witnesses. In addition to the medical records which reflect Galatis’s lucidity and ability to execute a will knowing the Greek charity and other beneficiaries, the trial evidence included the eyewitness testimony of three attesting witnesses to Galatis’s will signing. The drafting attorney and the two nurses who witnessed the execution of the will on February 9 all testified that Galatis was alert, responsive, and of sound mind. Specifically, Attorney O’Neil testified that in her opinion, Galatis understood the contents of the will at the time it was executed and that Galatis also understood the nature of his bounty, was of sound mind at the time he executed his February 9 will, and had testamentary capacity. Nurse Maryann Benoit observed Galatis to be alert and of sound mind, and seeming to understand the act of making a will. Benoit testified that, based on her observations, Galatis was aware that he was signing a will, that he knew that he was signing a will, that he was aware of who was around him when the will was signed, and that he “was alert and knew what he was doing.” Nurse Jennifer Mathisen testified that while she did not have a personal recollection of the will signing ceremony, she would not have attested to the signing of the will if Galatis were not competent to sign. See Farrell v. McDonnell, 81 Mass. App. Ct. 725, 727-731 (2012).
The testimony of the attorney and the witnesses to the will as to Galatis’s lucidity was corroborated by the testimony of *287 Galatis’s friends, Steven Damaskos and Demetrios Skopas. Damaskos testified that “he found Mr. Galatis to be clear minded and able to communicate during his visits at the hospital,” and Skopas testified that he had no difficulty communicating with Galatis until the day of his death and that when Galatis executed the February 9 will “[h]e had a clear mind.”
3. The will consistency. I also consider as support for Galatis’s testamentary capacity that the will signed February 9, which was prepared by an attorney, was a virtual dispositional match to the first will signed February 1, which was prepared by a nonattomey and signed by Galatis eight days before, when it is undisputed that Galatis was of sound mind with testamentary capacity.
Specifically, the February 9 will is materially consistent with the principal dispositional wishes of the first February 1, 2000, will, including the creation and formation of the Greek educational charitable trust which was Galatis’s principal bounty. Both the February 9 will and the February 1 will contain consistent provisions providing for Galatis’s current tenants in one of his real estate holdings in Greece to remain there rent free for as long as they lived. Additionally, both the February 9 will and the February 1 will are consistent in appointing Skopas the executor. Finally, both wills name Eugenia Bodenlos, a friend of Galatis’s, as the contingent executor. The February 9 will only differs in a minor change in the makeup of the administrative committee which was to oversee the assets of the Greek charitable trust. There were other important points of similarity apart from the educational foundation. For example, the February 9 will and the February 1 will both provide for eleven individual monetary bequests, naming the exact same eleven beneficiaries.
“Testamentary capacity requires ability on the part of the testator to understand and carry in mind, in a general way, the nature and situation of his property and his relations to those persons who would naturally have some claim to his remembrance.” Goddard v. Dupree, 322 Mass. 247, 250 (1948). These beneficiary and dispositional similarities are remarkably consistent and reflect that Galatis was able to fully understand the provisions of a will on February 9. The will consistencies are further evidence that Galatis had the ability to understand and appreciate the nature of his property and to execute a will knowing the objects of his bounty on February 9.
For all of these reasons I dissent. The trial record I conclude by *288 a preponderance of the evidence proves that Galatis had testamentary capacity.

 Given the totality of the trial evidence that Galatis was lucid and alert at the time of the will signing, including especially the medical records, it is inferentially reasonable to conclude that the will was likely signed in the afternoon. This inferential timeline is supported by post 2:00 p.m. medical record entries as well as the nurse’s note at 7:00 p.m. about legal papers and a will signing. The proponents of the will also submit there was an afternoon will signing.

 The majority’s reliance on the handwriting in Galatis’s signature on the February 9 will, as compared to his signature on earlier medical consent forms and the February 1, 2000, will, is tenuous. Our case law makes clear that a testator’s signature to a will need not be in any particular form. See Chase v. Kittredge, 11 Allen 49, 53 (1865).